Cheshire,
No. 5772.

FRED R. O'DONNELL

*v.*

PAUL S. CRAY, *Ex'r.*

Argued October 1, 1968.
Decided November 26, 1968.

*Olson, Reynolds & McMahon,* ( *Mr. Arthur Olson, Jr.* orally ), for the plaintiff.

*Bell & Kennedy* ( *Mr. Ernest L. Bell, III* orally ), for the defendant.

LAMPRON, J.  Action by the plaintiff real estate appraiser for professional services rendered to the defendant, executor of the will of Eugene P. Cray. Trial by the Court ( *Dunfey,* J.) resulted in a verdict for the plaintiff in the amount of $2,150. Defendant's exceptions, among others, to the denial of his motions for a nonsuit, a directed verdict, and to set aside the verdict were reserved and transferred.

There was evidence that an associate of the plaintiff, named Greene, was contacted by counsel for defendant relative to an appraisal of about 108 parcels of real estate which might be required in the settlement of the estate of Eugene P. Cray. This was followed by a meeting of the plaintiff and Greene with the defendant and his counsel. It was testified that the price of appraisals was discussed in the office of defendant's counsel in Keene before the three joined the defendant in his office in Walpole. Greene testified they told counsel the cost was " anywhere between three hundred to four hundred and fifty dollars a parcel. This could be high or low, but it should be somewhere in this bracket. " It was decided at the meeting of all four that plaintiff's firm was first to appraise four specified parcels which " would pretty much cover what the majority of the Cray properties were over-all. "

Written appraisals by plaintiff's firm of these four parcels, each containing from 14 to 22 pages, were introduced in evidence. Each contained the legal description of the property or reference thereto, restrictions, if any, prior assessments, highest and best use, zoning requirements, if any, an analysis of the neighborhood, a general description of the property and of the improvements, the value of the property determined on a replacement cost approach, an income, and a market data method, and also fair market value at which it was appraised.

Another exhibit was a master report which was applicable to these and any other of the Cray properties which might be appraised. It contained items considered in an appraisal, a general discussion of valuation, limiting conditions to which each appraisal is subject, the background, experience and qualifications of plaintiff and his associate.

Greene testified that he spent about 7 days in the field, another

5 or 6 days making mathematical calculations, and that another 4 or 5 days of typing and reproduction were required to make and produce the four appraisals and the master report. In addition he also testified that he spent 3 or 4 days with the defendant Cray viewing over 40 other properties in the estate located from Putney, Vermont to Ludlow, Vermont.

After the five reports were delivered to Cray, Greene had a conference with him in which he submitted a contract price of $38,000 for the appraisal of all of the more than 100 properties in the estate. Cray decided that this was more than he wanted to spend on the project. Greene testified that Cray then told him to submit a bill for what he had done and the submitted amount of $2,150 was "a very, very fair bill" in Greene's opinion. He testified that he never heard from Cray again although he attempted to reach him and left word for Cray to call him. Later he saw defendant's counsel and asked him why he had not heard from Cray and was told "Mr. Cray felt the bill was excessive."

Cray testified that no fees for the appraisals were ever quoted to him. He admitted seeing Greene about 6 times in February and spending 2 or 3 days showing him Cray properties in Vermont. He further testified that the four appraisals submitted were of no value to him or the estate and that he never promised to pay for them. Lastly he testified that these four appraisals were made by plaintiff "to show me how they did it . . . and from that I assumed some day they were going to tell me what they were going to charge to do the one hundred and eight pieces."

"The plaintiff had the burden of producing evidence from which the intention of the parties may be discovered, the nature and extent of their obligations ascertained and their rights determined." *Maloney* v. *Company,* 98 N. H. 78, 81. This is established by evidence of what the parties said or did, their overt acts and what they gave each other to understand. *Saucier Co.* v. *McVetty,* 107 N. H. 419, 421. Any undisclosed meaning or intention which one of the parties might have had is immaterial in arriving at the existence and terms of a contract between the parties. *McConnell* v. *Lamontagne,* 82 N. H. 423, 425. When, as here, there is a conflict in the evidence, the existence and terms of the contract are questions to be resolved by the trier of facts who may accept or reject in whole or in part any testimony of the parties. *Saucier Co.* v. *McVetty, supra.*

The Trial Court could properly find on the evidence that the plaintiff offered to make appraisals for the defendant at a cost of $300 to $450 each. The Court could further find, from the defendant's knowledge that Greene was in his office thereafter on several days obtaining information about the Cray properties, and from the fact that he saw Greene probably a half dozen days in all and spent two 7 hour days and part of a third showing Greene about 40 of the estate's properties in different locations in Vermont, that Cray had expected to pay for the work done. Further the Trial Court could properly find that the bill of $2,150 submitted by plaintiff to defendant for this work was reasonable and within the understanding of the parties.

Defendant's exceptions are overruled, and the order is

*Judgment on the verdict.*

All concurred.