Estate of Beatrice M. Labombarde, Raymond A. Labombarde, Philip deG. Labombarde, and Yvette L. Chagnon, Coexecutors, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 3937–70.   Filed August 9, 1972.

*Stanley Worth*, for the petitioners.

*A. W. Dickinson*, for the respondent.

STERRETT, *Judge:* Respondent determined a deficiency in the Federal estate tax of the Estate of Beatrice M. Labombarde in the amount of $47,151.02. Due to concessions the issues remaining for adjudication are:

(1) Whether money paid to or on behalf of decedent by her three children constitutes an indebtedness deductible under the provisions of section 2053(a)[1] as a claim against her estate.

(2) Whether the conveyance by decedent of an interest in Florida realty to her three children 14 months prior to her death was a transfer in contemplation of death.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Decedent, Beatrice M. Labombarde, died June 1, 1968, a resident of Nashua, N.H. Petitioners Raymond A. Labombarde (hereinafter referred to as Raymond), Philip deG. Labombarde (hereinafter referred to as Philip), and Yvette L. Chagnon (hereinafter referred to as Yvette), decedent's children, are the coexecutors of her estate. The Federal estate tax return was timely filed by petitioners.

Petitioners, following the death of their father, decedent's husband, in 1951, were concerned about decedent's financial situation. They believed her income would not be sufficient to maintain her standard of living. Therefore, in 1952 or 1953, after a discussion

---

[1] All statutory references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

among themselves, the three children agreed that they would each convey approximately $5,000 per year to their mother so as to permit her to live comfortably. Decedent was not a party to this discussion, but was subsequently informed of the arrangement.

In compliance with the agreement Raymond and Philip made conveyances to or on behalf of decedent until her death. Yvette, due to personal reasons, found it necessary to curtail her contributions in 1958. Such amounts may be reflected as follows:

| Year | Raymond | Philip | Yvette |
|---|---|---|---|
| 1953 | $2,177.08 | $2,177.08 | $2,177.08 |
| 1954 | 4,490.00 | 4,490.00 | 4,490.00 |
| 1955 | 6,091.36 | 6,091.36 | 6,091.36 |
| 1956 | 8,449.73 | 8,449.73 | 8,449.73 |
| 1957 | 5,401.39 | 10,937.55 | 10,937.55 |
| 1958 | 9,625.25 | 4,691.34 | 4,691.34 |
| 1959 | 13,319.40 | | |
| 1960 | 6,230.28 | 4,900.00 | |
| 1961 | 7,653.60 | 5,000.00 | |
| 1962 | 7,390.25 | 5,000.00 | |
| 1963 | 9,861.67 | 5,000.00 | |
| 1964 | 6,839.21 | 5,000.00 | |
| 1965 | 4,879.30 | 5,000.00 | |
| 1966 | 5,027.85 | 5,000.00 | |
| 1967 | 5,400.00 | 5,000.00 | |
| 1968 | 383.35 | 5,000.00 | |
| Total | 103,219.72 | 81,737.06 | 36,837.06 |

Schedule K, "Debts of Decedent and Mortgages and Liens," of the U.S. estate tax return lists indebtedness to decedent's three children in the following amounts:

Indebtedness to Raymond Labombarde _____ $65,833.33
Indebtedness to Philip Labombarde _____ 75,833.33
Indebtedness to Yvette Chagnon _____ [1] 15,833.33

[1] The amount of indebtedness claimed on the estate tax return was arrived at through an estimation based on a plan to convey $5,000 each year to decedent. At the time of trial the extent of the indebtedness was based on reconstruction from a notebook owned by decedent and not discovered until 1971, and from petitioners' checkbooks.

Petitioners have not requested that the amount of the claimed advances be increased to coincide with the above-noted figures. We therefore need deal only with the amounts claimed on the return.

In the initial years petitioners conveyed their funds to decedent by endorsing dividend checks and checks received from a trust to decedent. Subsequently, funds were transferred directly by checks from petitioners to decedent. However, a substantial portion of the contributions received by decedent consisted of indirect benefits conveyed through the payment of property taxes on decedent's home, decorating expenses, food, clothing and travel expenditures, and the cost of acquiring an automobile for decedent.

On June 3, 1965, Philip, as president of International Paper Box Machine Co. (hereinafter referred to as International) of Nashua,

N.H., a closely held corporation, and Raymond, as vice president, with the assistance of tax counsel, executed an "Agreement for Stock Redemption." Such agreement provided that a deceased shareholder's stock would be redeemed by the corporation in an attempt to maintain the corporation's closely held stock ownership. The execution of the agreement was considered to be the first step in estate planning for the shareholders of International.

In the fall of 1966 Philip contacted Stanley Worth (hereinafter referred to as Stanley), petitioners' tax counsel, to schedule a meeting between decedent, petitioners, and Stanley to discuss estate planning for decedent. At that meeting, in October of 1966, Philip informed Stanley about the yearly advances which each of the three children had been making to their mother. Philip asked, "[W]hat would happen if my mother should die and there was no record of those advances?" He further queried, "[W]hat could we do to avoid upon her death having to pay an estate tax on that portion of the estate, which in fact represents advances that we had made?"

Stanley, in an attempt to alleviate the predicament, said he would draft a form letter for the deceased to copy in her own handwriting. The letter reads as follows:

*October 15, 1966*

DEAR PHILIP, RAYMOND AND YVETTE:

I am sure it is not necessary for me to repeat, in writing, what I have said to each of you many times, my appreciation of your many kindnesses to me, particularly since the death of your father. There is, however, one matter which I feel I must make a matter of record and which I should have done a long time ago.

Without any urging on my part, each of you three children has been very solicitous to make sure that I would never have any worry about financial matters. Any time you sensed that I wanted to buy something, some or all of you came forward with the money so that I did not have to sell any of my property in order to make such purchase. As the result, without reducing my standard of living, I find that I now have more property than I had when your father died. The explanation, of course, is the advances which you children have continuously made to me.

I have always regarded the payments which you made to me or for my account as advances by you children, and not gifts. I now want to make sure that there is no misunderstanding either as to the fact that such advances were loans to me or as to the amount advanced by each of you children.

While I have not kept track of the amounts, I am sure that each of you can, from your records, determine how much each of you has advanced to me since your father's death. I will then sign a note to each of you for the total amount each of you has advanced to me.

I cannot promise any of you that I will be able to pay off amount of the note during my remaining years, but I am sure that upon my death there will be sufficient property to take care of the remaining balance on those notes.

Your Mother,

(S) BEATRICE M. LABOMBARDE

On November 23, 1966, decedent executed three separate documents entitled "Acknowledgment of Indebtedness" and conveyed them to her three children. The instrument transferred to Philip stated as follows:

*November 23, 1966*

Acknowledgment of Indebtedness

This will acknowledge that I am indebted to Philip deG. Labombarde in the amount of Seventy Thousand ($70,000) Dollars, representing loans made to me by him over a period of some 15 years.

(S) Beatrice M. Labombarde

State of New Hampshire
County of Hillsborough

Before me, a Notary Public, appeared Beatrice M. Labombarde, to me well-known, who, having been first duly sworn, stated that she executed the foregoing Acknowledgment of Indebtedness as her free act and deed this 23rd day of November, 1966.

(S) James L. Sullivan
*Notary Public.*

The acknowledgment conveyed to Raymond was identical in amount to the above while the instrument transferred to Yvette acknowledged a total indebtedness of $20,000. Such documents were also drafted by Stanley.

On the same day, November 23, 1966, decedent executed her last will and testament. It had been prepared by James L. Sullivan (hereinafter referred to as Sullivan) of the law firm of Sullivan, Gregg & Horton, the attorney for the Labombarde family. Sullivan had no connection with the preparation of the acknowledgments. He felt such documents presented an unusual situation and therefore, after requesting petitioners to leave the room, asked decedent whether she signed them of her own free will. She replied in the affirmative to both questions.

At the October meeting it was noted that decedent owned an undivided ¼ interest in a home in Fort Lauderdale, Fla. The remaining interest was owned by petitioners. Such dwelling was used by decedent and petitioners as a winter home. Decedent agreed to convey her interest to petitioners in equal shares as the first step in making payment under the acknowledgment of indebtedness. In compliance with this decision decedent copied and conveyed the following letter, written by Stanley, to petitioners:

Dear Philip, Raymond and Yvette,

Following up my hand-written letter to you dated October 15, 1966, and having received from each of you information as to the exact amount of the loans which you have made to me over a period of some 15 years since your father's death, I have prepared and hand each of you my "Acknowledgment of Indebted-

ness" representing accumulated loans, which I have signed and acknowledged before a Notary Public.

I expect to go to Florida in the very near future, and, while there, it is my intention to deed to each of you, in equal shares, my one-fourth (¼) undivided interest in the property known as 3019 N.E. 21st Street, Fort Lauderdale, Florida, the value of which will be applied by you as a payment on account of my indebtedness.

For the purpose of determining the amount of this payment, I will have the value of my undivided one-fourth (¼) interest appraised by a reputable real estate appraiser in Fort Lauderdale.

Whether I am able to make further payments to each of you on account of such indebtedness during my lifetime will depend upon future circumstances, but any balance remaining due to each of you at my death will, of course, be a valid claim against my estate. As each of you well knows, I have greatly appreciated your indulgence in making these loans to me, and your patience in awaiting payment of them.

> With love, as ever
> Your Mother,

> (S) BEATRICE M. LABOMBARDE

Such letter was transferred to petitioners with the acknowledgment of indebtedness.

Decedent, on March 27, 1967, received an appraisal of the real estate. The value noted therein was $50,000. Decedent's interest totaled $12,500. Decedent transferred title to petitioners on April 5, 1967. However, she continued to live in the Florida home during the winter months subsequent to the transfer of her interest to petitioners.

Thereafter, on April 10, 1967, petitioners executed a joint letter to decedent which had been drafted by Stanley. It provided as follows:

> *April 10, 1967*

DEAR MOTHER:

As you indicated you would do in your letter of November 23, 1966, you have deeded to each of us an undivided one-twelfth interest in the Fort Lauderdale property, thereby disposing of your undivided one-fourth interest therein. You also have obtained an appraised value of the entire property, one-fourth of which represents your interest, namely $12,500.00.

We have each recorded as a payment by you on your note to each of us the amount represented by the one-twelfth interest as determined by the appraisal, so that the balances due us under your notes will now be as follows:

| | |
|---|---|
| Philip | [2]$70, 833. 33 |
| Raymond | $65, 833. 33 |
| Yvette | $15, 833. 33 |

---

[2] Subsequent to the acknowledgment of indebtedness from decedent to Philip, Philip conveyed an additional $5,000 to his mother. This explains why the amount noted on the acknowledgment has not been decreased with the transfer of a portion of decedent's interest in the Florida property to Philip. This subsequent advance by Philip was not acknowledged by deceased.

After the children transferred the above-quoted letter to deceased, Philip conveyed an additional $5,000 to his mother. Such amount was acknowledged by a note from deceased. It however excluded a payment date or interest payable. This additional advance to deceased explains why the estate tax return lists indebtedness to Philip as $75,833.33.

We find it somewhat peculiar that, though Raymond also made additional advances to deceased, the total debt owed him was not likewise increased.

Each of us now has a Xerox copy of the appraisal and a copy of this letter so that you, and each of us, will have a complete record of the transaction.

We each desire to express our appreciation for what you have done.

With love,

(S) Philip Labombarde

(S) Raymond A. Labombarde

(S) Yvette L. Chagnon

Until the October 1966 meeting petitioners had not kept a record of the amounts advanced to decedent. The amount of indebtedness acknowledged on November 23, 1966, was arrived at through an estimation based on a plan to convey $5,000 each year to decedent. At the time of trial the extent of the indebtedness was based on reconstruction from a notebook owned by decedent and not discovered until 1971 and from petitioners' checkbooks.

Until the October meeting petitioners had never taken any written evidence of indebtedness from decedent nor had they ever requested repayment. Decedent, prior to the transfer of her interest in the Florida property, had never repaid the earlier transfers. After the execution of the acknowledgment of indebtedness no time was set for repayment nor was an interest rate established.

There was no expectation on the part of petitioners nor an intention by decedent that the advances would be paid by decedent in her lifetime.

Decedent died of myocardial infarction, commonly referred to as a coronary. Until the time of the seizure which ultimately caused her death, she was in good physical and mental condition. Decedent traveled extensively; in the winter to Florida and in the summer to Lake Winnepesaukee. On the morning of her death she attended her granddaughter's medical school graduation.

OPINION

Beatrice M. Labombarde died June 1, 1968. Petitioners, decedent's children, following the death of their father in 1951, were concerned about decedent's financial situation. Therefore, in 1952 or 1953, they agreed among themselves to each convey approximately $5,000 per year to or for their mother's benefit so as to permit her to live comfortably. In 1966 petitioners, along with the deceased, met with tax counsel to discuss the status of the funds contributed by petitioners. Following counsel's instructions decedent wrote a letter to petitioners which indicated that she had considered the amounts conveyed to her to be advances and that upon petitioners' determination of the amounts owed she would sign a note acknowledging such loans. Deceased then executed and conveyed acknowledgments of indebtedness to her three children. Simultaneously, she initiated and transferred another letter indicating that she would convey her one-quarter interest in the

Florida home to petitioners in partial payment of these debts. Such interest was conveyed shortly thereafter.

The first issue presented for adjudication relates to whether the money paid to or on behalf of decedent by her three children constitutes an indebtedness deductible under the provisions of section 2053 as a claim against her estate. Section 2053 states in part as follows:

SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

\* \* \* \* \* \* \*

(3) for claims against the estate \* \* \*

\* \* \* \* \* \* \*

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

\* \* \* \* \* \* \*

(c) \* \* \*

(1) LIMITATIONS APPLICABLE TO SUBSECTIONS (a) AND (b).—

(A) CONSIDERATION FOR CLAIMS.—The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; \* \* \*

It is apparent from the above-quoted language that the general prerequisite to the deductibility of petitioners' claims under section 2053 is the existence of a valid debt under New Hampshire law that represents an allowable claim against the estate. On the facts presented it is the decision of this Court that under New Hampshire law no such obligation was ever created. Rather, the transfer of funds to or for the benefit of deceased was in fact a series of gifts.

A gift has been defined as the voluntary transfer of property from one to another without any consideration or compensation therefor. *Curriden* v. *Chandler*, 79 N.H. 269, 108 Atl. 296 (1919). A loan on the other hand is the delivery by one party and the receipt by the other of a given sum of money upon an agreement express or implied to repay. *Pratt* v. *Robert S. Odell & Co.*, 49 Cal. App. 2d 550, 122 P. 2d 684 (1942); *Citizens Bank of Waynesboro* v. *Mobley*, 166 Ga. 543, 144 S.E. 119 (1928); *Union Securities* v. *Merchants*, 205 Ind. 127, 186 N.E. 261 (1933); *Dobler Brewing Co., Inc.* v. *Feeney*, 159 Misc. 173, 288 N.Y.S. 989 (1936); 54 C.J.S. 653–54.[3]

---

[3] A reference to a non-New Hampshire case indicates no decision referring to that point of law has been discovered in the New Hampshire decisions. The cases cited give the majority view on the point of law.

The question as to whether a transaction is really a gift or a loan is determined by the intention of the transferor, which must be gathered from all the facts and circumstances attending the transfer of such property. *Barrett* v. *Cady*, 78 N.H. 60, 96 Atl. 325 (1915) ; *Cox* v. *Cox*, 72 N.H. 561, 58 Atl. 504 (1904). In *Coburn* v. *Storer*, 67 N.H. 86, 36 Atl. 607 (1892), the Supreme Court of New Hampshire, in determining whether a transfer from a wife to her husband was a gift or a loan noted that "The intention of the parties, found as a fact from competent evidence, must determine the character of their act." More recently, in *Saucier Co.* v. *McVetty*, 107 N.H. 419, 223 A.2d 520, 521 (1966), the court noted:

A contract may be established by spoken or written words or by acts or conduct and where there is a disputed question of fact as to the existence and terms of a contract it is to be determined by the trier of the facts, provided there is any evidence from which it could be found there was a contract between the parties. * * * The mere state of mind of the parties is not the essential object of inquiry, but rather, what the parties said or did ; their overt acts and what they gave each other to understand. These are the decisive considerations and not any undisclosed meaning or intention which one of the parties might have had.

*O'Donnell* v. *Cray*, 109 N.H. 223, 248 A.2d 83 (1968) ; *Griswold* v. *Heat Inc.*, 108 N.H. 119, 229 A.2d 183 (1967).

As indicated above, from the facts presented we must hold that a gift rather than a loan was contemplated. In support of this conclusion we particularly note that petitioners' decision to convey funds to the deceased was done unilaterally; the decedent had no knowledge of it until receipt of the money. It is therefore manifest that the parties could not have discussed the creation of a loan at that time. The decision to convey the funds was based on the children's laudable feeling of a moral or filial obligation to support and maintain their mother. From 1953 until 1966 no notes evidencing the supposed debt were issued, no record of money conveyed was kept, no demand for or offer of payment was made, and interest was not owed or paid. The money was conveyed not only directly to decedent by cash or check, but in addition, petitioners purchased food, clothing, paid bills, taxes, etc., on decedent's behalf. Yvette concluded making conveyances to deceased in 1958, yet she neither requested nor received a note evidencing the debt or payment until 1966.

The execution of the acknowledgments in 1966 was initiated by petitioners solely to reduce estate taxes. The letters and acknowledgments were initiated by petitioners' tax counsel and merely copied by the deceased. The letter of October 15, 1966, indicates that the deceased did not contemplate payment prior to death, and petitioners were the sole beneficiaries under decedent's will. The acknowledgments omitted a payment date and the extent of interest payable. Both Raymond and

Philip conveyed additional funds to the deceased subsequent to the execution of the acknowledgments, yet the debt owed Raymond was never increased by these later advances and the deceased only acknowledged a portion of Philip's subsequent conveyances. In short, at the time the money was conveyed to deceased no intent to create a debt existed. Such intention materialized only upon ascertaining the applicable estate tax consequences. That is, the acknowledgments of indebtedness were not the acknowledgments of preexisting debts, but rather the attempt to create a debt for the first time.

Further, a note sought to be recovered without consideration cannot be recovered. There must have been some preexisting obligation to form a basis for an effective promise. *Martin* v. *Stone*, 67 N.H. 367, 29 Atl. 845 (1893); *Sanborn* v. *Sanborn*, 65 N.H. 172, 18 Atl. 233 (1889); *Flint* v. *Pattee*, 33 N.H. 520 (1856). In this regard the court in *Johnson* v. *Greenough*, 33 N.H. 396, 398–399 (1856), stated:

This subsequent promise is upon a past consideration, and, unless the consideration be of such character that of itself it imports a previous request it is not sufficient to sustain a promise without an allegation that it was moved at the instance and request of the defendant * * *. This doctrine that a precedent debt or promise from one party cannot of itself form a sufficient consideration for a promise by the other, is sustained by numerous authorities, ancient and modern, English and American.

\* \* \* \* \* \* \*

*The principle to be extracted from the case is, that when the consideration is executed, an express promise, without an express previous request, can in no case furnish a cause of action.* [Emphasis supplied.]

See *Perreault* v. *Hall*, 94 N.H. 191, 49 A. 2d 812 (1946); *Warren* v. *Weaver*, 78 N.H. 108, 97 Atl. 748 (1916).[4] The execution of the notes in 1966 was based solely on past consideration. Clearly, therefore, the facts of the instant case fall squarely within the purview of the above-quoted case.

Even were we to reach a contrary conclusion with respect to the allowability of the claims under State law, therefore holding that the basic requirement of 2053(a) had been met, the claims would still run afoul of the limitation on subsection (a) contained in subsection (c). This latter subsection further requires that the deduction for any claims for "any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted *bona fide* and for an adequate and full consideration in money or money's worth." (Emphasis added.)

While unquestionably money or money's worth was received by decedent during her lifetime, we are constrained to hold that the purpose of the payment was not to create a debt but rather in furtherance of

---

[4] The acknowledgements in issue are not negotiable promissory notes. Therefore, consideration is not presumed. See *Morton* v. *Stone*, 67 N.H. 367, 29 Atl. 845 (1893).

the children's admirable desire to see their widowed mother live out her days in a style to which she was accustomed. As is understandable in the exemplary family situation, there simply was no intent to create a bona fide debt.

We find sustenance for this position in *Glascock* v. *Commissioner*, 104 F. 2d 475, 476 (C.A. 4, 1939), affirming 38 B.T.A. 1530, wherein the court stated:

*When the conveyance was made to the mother there was no definite agreement or promise upon which any legally enforceable claim could have been asserted against her. Everything was left to her judgment in the matter. This being true, it follows that there were no claims that could have ripened into legal and enforceable claims on the death of the mother.* [Emphasis supplied.]

Cf. *Carney* v. *Benz*, 90 F. 2d 747, 749 (C.A. 1, 1937); *Estate of Charles L. Woody*, 36 T.C. 900, 903 (1961); *William Francis Mercil*, 24 T.C. 1150 (1955); see also *Estate of Frances R. Pollard*, 52 T.C. 741 (1969).

Further, we note that several of the decisions promulgated under section 166, or its forefathers, relating to the deductibility of bad debts, lend additional support to our conclusion. In *Estate of Carr V. Van Anda*, 12 T.C. 1158 (1949), affirmed per curiam 192 F. 2d 391 (C.A. 2, 1951), the Tax Court stated:

It is elementary that one of the essential prerequisites for a bad debt deduction is that the debt must have an existence in fact. * * * *The giving of a note or other evidence of indebtedness which may be legally enforceable is not in itself conclusive of the existence of a bona fide debt.* * * * It must be clearly shown that it was the intention of the parties to create a debtor-creditor status. * * *

Intrafamily transactions are subject to rigid scrutiny, and transfers from husband to wife are presumed to be gifts. However, this presumption may be rebutted by an affirmative showing that there existed *at the time of the transaction* a real expectation of repayment and intent to enforce the collection of the indebtedness. [12 T.C. at 1162.]

[Emphasis supplied.]

More recently, this Court in *Sax Rohmer*, 21 T.C. 1099, 1103–1104 (1954), stated:

Consideration must be bargained for in order to support a contract and negative a gift; and "nothing can be treated as a consideration that is not intended as such by the parties." *Fire Insurance Association* v. *Wickham*, 141 U.S. 564, 579 (1891). See 1 Williston, Contracts, sec. 101; Restatement, Contracts, sec. 75. The written assignment which effected the transfer of a one-half interest in the petitioner's novel makes no mention of a contract requiring the performance of services by his wife. Rather, the record discloses that it was executed on the advice of petitioner's attorney to split their income in the attempt to effectuate tax savings. Financial dealings between husband and wife are especially subject to the scrutiny of the taxing authorities. * * * The evidence does not convince us that here was a preexisting agreement which required such services as the consideration for a one-half share in petitioner's income. In the absence of proof that his wife's services were rendered as consideration for this assignment, the

interest transferred to her by the assignment must be deemed a gift unreduced by the value of such services.

Finally, in *Elizabeth N. Rude*, 48 T.C. 165, 172 (1967), the Tax Court in determining whether a gift or loan was intended noted:

She then contends that the above language from the property settlement agreement incorporated in the decree of divorce confirms the debtor-creditor relationship between herself and Jack, indeed even created an enforceable judgment under California law. It is significant, however, that the petitioner has produced no agreement, as of the time the conveyances to Jack were made, which reflects such alleged debtor-creditor relationship. *All she has presented as evidence is her own self-serving statements of such indebtedness plus a separation agreement written over 6 years later.* [Emphasis supplied.]

Applying the above-quoted language to the facts at hand, it is apparent that the petitioners have failed to demonstrate with substantive *contemporaneous* evidence an agreement or intention to create a debt. The subsequent acknowledgments are not sufficient to carry their burden of proof.

Upon an examination of the entire record we conclude that the conveyances of money by petitioners to deceased do not form the basis for claims deductible under section 2053.[5]

The second issue concerns the transfer of the decedent's interest in the Florida residence to petitioners. Respondent contends such conveyance was in contemplation of death, as set out in section 2035,[6] which states:

SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH:

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment) ; but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.

Petitioner, on the other hand, asserts that such property was transferred in partial payment of the debt.

---

[5] This decision is applicable to advances before and after the execution of the acknowledgments. The acknowledgments concerned only conveyances prior to the initiation of such documents. A substantial portion of the funds transferred after October 1966 did not increase petitioners' supposed debt. Of the remaining portion only one-half was ever acknowledged by the deceased. It is therefore apparent that neither petitioners nor deceased considered such amounts to be bona fide loans.

[6] We find it surprising that respondent did not at least mention the possible application of sec. 2036(a)(1) as the decedent conveyed her interest and continued to reside therein.

The purpose of section 2035 is "to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." *United States* v. *Wells*, 283 U.S. 102, 117 (1931). The fact that the decedent was not in fear of imminent death is not controlling. See *United States* v. *Wells, supra* at 117. The question is one of fact; whether the dominant motive in making the transfer was the thought of death or a purpose associated with life. *United States* v. *Wells, supra; Estate of Maurice H. Honickman*, 58 T.C. 132 (1972).

The present facts indicate that the transfer of property occurred almost simultaneously with the execution of decedent's will and the acknowledgments of indebtedness. Such transfer was initiated by tax counsel in an obvious attempt to substantiate the validity of the supposed debt and, at the same time, remove such property from decedent's estate. Further, the Florida residence was also disposed of in decedent's will in case the transfer of title had not occurred prior to death. These circumstances strongly support the statutory presumption and respondent's determination, and petitioner has failed to overcome this presumption. *Diamond's Estate* v. *Commissioner*, 159 F. 2d 672 (C.A. 2, 1947), affirming a Memorandum Opinion of this Court; *Oliver* v. *Bell*, 103 F. 2d 760 (C.A. 3, 1939); *Estate of Maurice H. Honickman, supra*.

Upon an examination of the entire record we conclude that the transfer of property was made in contemplation of death.

To reflect concessions on unrelated issues,

*Decision will be entered under Rule 50.*