MARVIN E. TRAUTWEIN and E. MARGARET TRAUTWEIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Trautwein v. Commissioner
Docket No. 2978-74.
United States Tax Court
T.C. Memo 1975-262; 1975 Tax Ct. Memo LEXIS 114; 34 T.C.M. (CCH) 1131; T.C.M. (RIA) 750262; August 11, 1975, Filed Marvin E. Trautwein, pro se. Gerald W. Leland, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent has determined a deficiency in the amount of $232.09 in petitioners' Federal income tax for 1972. The sole issue for decision is whether sums advanced by petitioner Marvin E. Trautwein for the support of his aged aunt and uncle were deductible as a nonbusiness bad debt pursuant to section 166(d), [1]/ or whether such sums were in reality gifts and therefore not deductible. *115 FINDINGS OF FACT At the time the petition was filed, Marvin E. Trautwein (hereinafter petitioner) and E. Margaret Trautwein, husband and wife, were legal residents of Minneapolis, Minnesota. In 1968, petitioner's aged aunt and uncle (hereinafter Betty and Ed) were in need of financial assistance. Both Betty and Ed had passed their 80th birthdays, and in their later years had been faced with poverty and deteriorating health. They were childless and lived alone in their own home. Betty had been confined to a wheelchair for several years and was quite senile. Ed received Social Security payments which amounted to approximately $130 per month. His only other known assets consisted of his home, which he held free of liens, a small bank account and burial insurance policies on the lives of himself and his wife. Neither Betty nor Ed had any close relatives other than petitioner and his three brothers. In early April 1968, petitioner and his brothers met and discussed Betty and Ed's "condition, and what to do about it." Petitioner first tried to convince Ed that he and Betty should move to a nursing home, but Ed refused. Ed did agree that he would allow a housekeeper to be hired to *116 assist in caring for Betty and himself. The brothers agreed to cover the cost, and their agreement was summarized in a letter dated April 10, 1968, written by Aronoel Trautwein (hereinafter Aronoel), one of the brothers, as follows: We are all in agreement that Ed and Betty can no longer live alone. Marvin talked to Uncle Ed, to try to convince him that he and Aunt Betty should move into a nursing home where they would get proper treatment. As you know, Marvin was unsucessful in this, but that Uncle Ed did agree that he would allow a housekeeper to be hired, to live in, and to take care of cooking, washing, etc. This seems to be a good compromise for the present. We further agreed that Uncle Ed could not be advised what the cost of this would be, as the cost would scare him, and he would either fire the housekeeper or worry himself to death over the cost. Our agreement is basically this, we would each contribute to a fund to pay the extra expenses, I would keep a record as to how much each spent, and these payments would be considered to be loans to be paid out of Uncle Ed and Aunt Betty's estate after their death. We know they have some money in the bank, that they have their *117 home clear, and that Uncle Ed has a small policy on both himself and Aunt Betty, which could provide for the funeral and burial expense. I, as administrator of Uncle Ed's estate, would have to pay these loans off before any disbursements could be made to any beneficiary under his will. We do run the risk that both Ed and Betty would out-live their own money. If this should happen to be the case, we could very easily lose some (or all) of the money which we are loaning them. We discussed this, and we are all in agreement that their well-being is paramount, and these risks would have to be taken. Aronoel was a banker, and he opened a bank account in his name for the money petitioner and his brothers contributed to the fund. Aronoel drew checks on this account to pay the various expenses incurred by Betty and Ed. In April 1968, a housekeeper was hired for Ed's home and her wages were paid from the funds supplied by petitioner and his brothers. Later in the same year, Ed became totally blind due to cataracts, and petitioner persuaded Betty and Ed to move to a nursing home where they could receive better care. The cost of the nursing home was $600 per month, and this cost was paid *118 with funds supplied by petitioner and his brothers. In August 1969, it appeared that neither Betty nor Ed would ever leave the nursing home, and Ed's house was sold. The sales transaction was handled entirely by Aronoel. The sales price was $4,000 and these proceeds were placed in the bank account Aronoel had established. Thereafter, petitioner made no further contributions. Petitioner and his brothers contributed the following amounts to the fund for Betty and Ed up to December 31, 1969: Marvin E. Trautwein
$ 2,332.52
Henry G. Trautwein
500.00
Aronoel H. Trautwein
7,925.00
$10,757.52
On December 31, 1969, Aronoel, purportedly as Ed's agent, executed a document in the form of a note in the amount of $2,332.52 payable to petitioner. Although petitioner considered Aronoel to be Ed's agent, no power of attorney or guardianship was ever established. Ed died in 1970 and Betty passed away in 1972. Both of them had been confined continuously to the nursing home they had entered in 1968. Aronoel, as executor of the estate of both Betty and Ed, paid the funeral costs and other incidental expenses from the assets remaining at the date of Betty's death. The balance *119 of $2,404.68 remaining in the estate was prorated among petitioner and his brothers in relation to each party's percentage contribution to the total fund. Petitioner received $521.31, leaving unrecovered $1,811.21 of the amount he had advanced. Petitioner and his wife filed a joint Federal income tax return using the cash method of accounting for the taxable year ended December 31, 1972. On this return, petitioner deducted $1,000 from gross income pursuant to section 166(d) as a nonbusiness bad debt. This deduction was disallowed by respondent as an unsubstantiated bad debt. OPINION It is clear that petitioner was unable to recover the entire amount of his advances to the fund created for the support of his aunt and uncle, but simply showing an economic loss is not sufficient to satisfy the requirements of section 166 [2]/ relating to nonbusiness debts. Sec. 1.166-1(c), Income Tax Regs., states that a bona fide debt is necessary for the allowance of a deduction under section 166, and a bona fide debt requires a debtor-creditor relationship based upon a valid enforceable obligation to pay a fixed sum of money. William Francis Mercil,24 T.C. 1150, 1153 (1955); *120 Evans Clark,18 T.C. 780, 783 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953); Estate of Carr V. Van Anda,12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951); Emil Weitzner,12 B.T.A. 724, 725 (1928). For a debtorcreditor relationship to exist, there must be evidence of a reasonable expectation of repayment of the debt. Estate of Carr V. Van Anda,supra;Evans Clark,supra.This reasonable expectation should exist at the inception of the transaction. Elizabeth N. Rude,48 T.C. 165, 172-173 (1967); cf. Estate of Beatrice M. Labombarde,58 T.C. 745, 755 (1972), affd. per order (1st Cir. Aug. 21, 1973). Cash advances between relatives must be carefully studied to distinguish a bona fide debt from a donative advance, and the burden rests with petitioner to show that his advances for the support of his aunt and uncle were loans rather than gifts. Armand P. Bartos,27 T.C. 1002, 1005 (1957); Estate of Carr V. Van Anda,supra;Evans Clark,supra; *121 Jacob Grossman,9 B.T.A. 643, 645 (1927). *122 We are not satisfied by the evidence that petitioner had a reasonable expectation of repayment or that the advances were not gifts. Although petitioner did testify that he expected to recover the full amount of his expenditures, the objective facts do not accord with this testimony. The original agreement of April 1968 between petitioner and his brothers was arranged due to Betty and Ed's inability to support themselves. Ed's meager income had forced the couple to live in squalor, and they had reached the point where they would be required to hire a housekeeper or enter a nursing home which, alone, would cost $600 per month. Prior to the April 1968 agreement, petitioner had urged Betty and Ed to enter the nursing home, and within a few months they were compelled to do so. Although Ed owned the $4,000 house, had a small bank account, and maintained modest burial insurance polcieies, we think petitioner was well aware that these assets would most likely be insufficient to allow complete repayment. The mere fact that Betty and Ed were in need of support is sufficient to indicate that their resources were inadequate both to support themselves in April 1968, and to later repay the advances. *123 The letter of April 10, 1968, quoted in part in our Findings, recognizes the risk that Betty and Ed would "out-live their own money" but states that "we are all in agreement that their well-being is paramount." In short, the record simply does not support a finding that petitioner could reasonably expect repayment. Petitioner and his brothers were aware of Betty and Ed's advanced age and deteriorating health and, as the nearest living relatives, were concerned. At the April 1968 meeting, when petitioner and his brothers made arrangements to make the money available to Betty and Ed, the advances were designated as loans only after petitioner's sister-in-law objected to the financial burden which would occur if the family simply made gifts of their payments. The whole tone of the letter of April 10, 1968, summarizing their agreement indicates that the brothers were primarily concerned with contributing money for the support of their aging and needy relatives, not that they were making loans. If Betty and Ed left enough money after their deaths, the advances would be repaid from their estates. If their estates were depleted, the advances would not be repaid. Obviously, there was no *124 intent to enforce repayment of the advances from any source other than the remaining balance in their estates. Considering all the evidence, we think the advances were donative in character. Estate of Carr V. Van Anda,supra.
Petitioner argues that the note executed by Aronoel, as Ed's agent, is evidence of a valid and enforceable debt obligation. Documents such as the one offered by petitioner may be evidence to indicate a bona fide debt, but such evidence is not conclusive. Estate of Carr V. Van Anda,supra at 1162. This formal documentation of the amount claimed as a debt by petitioner is little more than a memorandum of petitioner's claim. Its evidentiary value is diminished by the fact that Aronoel, without a power of attorney or guardianship, signed as Ed's agent. We are not called upon to rule on the legal validity of the document in question, merely its evidentiary value. We do not think this document is helpful to petitioner's cause. Petitioner and his brothers are to be commended for responding to the needs of their aging aunt and uncle and caring for them during the final years of their lives. But the12 Internal Revenue Code *125 is not structured to reward such laudatory actions. We can measure the claimed deduction only by the debt standards prescribed by section 166 and we are compelled to conclude that those standards are not met. Accordingly, Decision will be entered for the respondent.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.
2. / SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfifed that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩