Hillsborough
No. 7978

SEAL TANNING COMPANY

v.

CITY OF MANCHESTER

WAUMBEC MILLS, INC.

v.

CITY OF MANCHESTER

October 30, 1978

694

*Devine, Millimet, Stahl & Branch*, of Manchester (*Norman H. Stahl* orally), for the plaintiffs.

*Elmer T. Bourque*, city solicitor, and *James A. Manning*, assistant city solicitor (*J. Francis Roche* orally), for the defendant.

LAMPRON, C.J.   This case involves two petitions to abate sewer rental charges under RSA 252:15. The two cases were consolidated by the superior court and heard by a master. The main issue concerns the authority of the city of Manchester to impose a sewer rental charge on the plaintiffs for the use of a sewer to which they are not yet connected. The Master (*Chester C. Eaton*, Esq.) recommended that the sewer rental charge be abated until the plaintiffs' sewer facilities are connected to the sewer system, and that the plaintiffs be refunded all prior rental charges. The superior court approved the master's recommendation, and all questions of law raised by defendant's exceptions were reserved and transferred by *Flynn*, J. For the reasons hereinafter stated, we hold that the city is without authority to impose the questioned sewer rental charge until the plaintiffs are connected to the city sewer system.

The events of the case are the result of the nationwide effort to purify the polluted waters of our country. In 1968, the State of New Hampshire notified the city of Manchester that the city would have to stop discharging the city's sewage into the Merrimack River. The city, after careful study, undertook a program to build a sewage treatment plant with the State and federal governments paying 95 percent of the cost. The federal assistance was the result of the Federal Water Pollution Control Act Amendments of 1972. 33 U.S.C.A. § 1251 *et seq.* The city completed the treatment plant in May 1976, prior to the trial of this case, but had completed only one main sewer line (interceptor). This means that although the treatment plant was fully staffed and operable, and therefore incurring almost the full operation and maintenance costs, the plant was receiving only ten percent of the sewage it would treat when all of the interceptors were completed.

The plaintiffs, because of the nature of their products, are two of the larger polluters in Manchester. Both plaintiffs have always discharged their wastewater into the Merrimack River. Since December 1974, the plaintiffs have discharged into the river under the authority of permits issued by the United States Environmental Protection Agency. The permits required the plaintiffs to tie into the city's treatment facility when it became available and to file an executed contract with the city for the treatment of wastes.

Both plaintiffs subsequently received permits from the city for discharging wastewater into the Manchester treatment facility whenever that facility became available. The permits require the plaintiffs to pretreat their wastewater in order to reduce the level of certain pollutants that would be discharged into the city's system. At the time of the trial, Seal Tanning had spent $300,000 and Waumbec had spent $155,000 on pretreatment equipment in preparation for connecting to the city's system. There is no question that Waumbec Mills will be able to meet the pretreatment limitation of the federal and city permits, and it will therefore be allowed to connect when the system becomes available. Seal Tanning, however, may have a problem. Although there was evidence that it has installed the best pretreatment equipment obtainable, present technology cannot meet the chloride, and may not meet the sulphate, limitations. The city has waived the chloride limitation, but it has not waived the sulphate limitation. When Seal Tanning may be allowed to connect to the system is therefore indefinite.

The challenge in this case involves the sewer rental charge the city has imposed in order to finance the operation of the treatment plant.

The State statutes that allow the city to charge for the sewer service are RSA 252:9 and RSA 252:10. Because these statutes are crucial to the resolution of this case, they are fully quoted here.

252:9 Levying. The mayor and aldermen may assess upon the persons whose drains enter such main drains, common sewers or treatment facilities, or whose lands receive special benefit therefrom in any way, their just share of the expense of constructing and maintaining the same or paying off any capital debt or interest incurred in constructing and/or maintaining the same.

252:10 Sewer Rentals. For the defraying of the cost of construction, payment of the interest on any debt incurred, management, maintenance, operation, and repair of newly constructed sewer systems, including newly constructed sewage or waste treatment and disposal works, the mayor and aldermen may establish a scale of rents to be called sewer rents, and to prescribe the manner in which and the time at which such rents are to be paid and to change such scale from time to time as may be deemed advisable. Except in the case of institutional, industrial or manufacturing use, the amount of such rents shall be based upon either the consumption of water on the premises connected with the sewer system, or the number of persons served on the premises connected with the sewer system, or upon some other equitable basis.

In March 1976, the city enacted chapter 29 of its city ordinances, entitled "Sewer Rental Charges." The first section of this chapter is a statement of the purpose of the ordinance, and in pertinent part states:

The purpose of this chapter is to insure that all persons whose mains enter main drains, common sewers and treatment facilities and all persons whose lands receive or will receive a special benefit from said wastewater treatment facilities shall pay their just share of the costs of said facilities as hereinafter provided. An additional purpose of this chapter is to comply with the user charge requirements of the Federal Water Pollution Act Amendments of 1972 (PL 92–500) and amendments thereto.

The chapter then establishes the sewer rental charge:

Sec. 29-3. *Charges for Wastewater Treatment Facilities.*
Pursuant to RSA 252 a system of sewer rental charges is

hereby established and assessed for paying the cost of construction, payment of interest on debt incurred, management, maintenance, replacement, operation and repair of the City's wastewater treatment facilities. Said sewer rental charges shall consist of a service charge and a sewer user charge.

Sec. 29-4. *Payment By Owners.*

Sewer rental charges for residential premises, commercial establishments and industrial establishments shall be paid by the owner of any structure containing one or more dwelling units, commercial establishments or industrial establishments from which structure sewage discharges into the City sewer system or discharges directly or indirectly into the Merrimack River or any of its tributaries. In the case of structures from which sewage discharges directly or indirectly into the Merrimack River or its tributaries, said charges shall be payable with respect to premises which receive or will receive a special benefit from the construction of said wastewater treatment facilities.

The ordinance thereafter sets the service charge at a flat rate of $25 per quarter for industrial establishments, and a sewer user charge based on the number of pounds or gallons of various pollutants that are discharged into the sewer system. The parties stipulated at the trial that during the first year of operation of the sewer rental charge, Seal Tanning's charges would amount to approximately $75,000, and the charges for Waumbec Mills would approach $100,000.

At the trial below, the plaintiffs claimed that the city could not impose the sewer rental charge on them until their establishments were actually connected to the city sewer system and therefore actually using the treatment plant. The plaintiffs presented various legal theories to support their objection to the rental charge. They included the following:

1. The charge is illegal under the Federal Water Pollution Control Act Amendments of 1972 because it was imposed prior to receipt of wastewater treatment services.

2. The charge violates RSA ch. 252 for the same reason.

3. The plaintiffs are not receiving a "special benefit," so they do not fall within the terms of the ordinance or the statutes.

4. The sewer rental ordinance deprives plaintiffs of their property without due process of law, in violation of the fourteenth

amendment of the United States Constitution and Part I, Article 12 of the New Hampshire Constitution.

The defendant denied that the plaintiff's legal theories had any validity, and proposed its own theory that the two plaintiffs, by applying for and receiving permits from the city, had entered into contracts with the city. The contracts, the defendant contended, contained an agreement that the sewer rental charge would be paid by the plaintiffs prior to the actual connection with the sewer system.

The master ruled that no such contracts exist between the plaintiffs and the city, that the plaintiffs are not receiving any special benefit, that the city is without authority under the State and federal statutes to charge the plaintiffs before their sewer facilities are connected to the system. The defendant challenges the master's rulings, and also argues that equity requires that the plaintiffs be charged in advance of receiving wastewater treatment services.

■ The defendant first contends that the master erred in not finding a contract between the plaintiffs and the city. The argument is that acceptance of the permits created contracts that obligated the plaintiffs to pay the user charges prior to being connected to the sewer system. The master found that the plaintiffs never considered the permits as obligating them to pay the charges prior to connection, and that the city did not inform them that acceptance of the permits would be construed by the city as forming such contracts. In fact, the record indicates that the city advised the plaintiffs in a letter that "contractual obligations with industries can be completed. . ." after the permits were issued. The city does not challenge any legal principle used by the master in arriving at his conclusion that there is no contract between the parties. Apparently the main contentions by the city are that the evidence does not support the master's findings, and the city considered the permits to be contracts that bound the plaintiffs to pay the charges. "The disputed question of fact regarding the existence . . . of the agreement . . . is to be determined by the trier of fact in accordance with the applicable law." *H & B Constr. Co. v. Irwin & Sons*, 105 N.H. 279, 281, 198 A.2d 17, 19 (1964). "Any undisclosed meaning or intention which one of the parties might have had is immaterial in arriving at the existence . . . of a contract between the parties." *O'Donnell v. Cray*, 109 N.H. 223, 225, 248 A.2d 83, 84 (1968). *See also Harrison v. Watson*, 116 N.H. 510, 363 A.2d 204 (1976); *Saucier Co. v. McVetty*, 107 N.H. 419, 223 A.2d 520 (1966). We cannot say on the record that the master erred in finding no contract, and his ruling is sustained.

The city also challenges the master's ruling that the ordinance is not authorized by State law. RSA ch. 252 establishes two methods to pay for a sewer system. Under RSA 252:9, in order to pay construction and maintenance costs, a city may *levy* an assessment on a landowner who receives a special benefit from a sewer's construction. (Emphasis added.) Under RSA 252:10, a city may defray the costs of managing, maintaining, operating and repairing a sewer system by imposing a *"scale of rents"* on a landowner. (Emphasis added.) Chapter 29 of the Manchester City Ordinances was enacted pursuant to the authority granted by RSA ch. 252. According to the Manchester ordinance, owners of structures that either discharge waste into the city sewer system or into the Merrimack River, and who will specially benefit from the construction of a waste treatment facility, must pay a sewer rental charge. Nowhere in the ordinance does it specify whether the city derived its authority from RSA 252:9 or from RSA 252:10. There is a difference, however, between an assessment levy, RSA 252:9, and a sewer rental charge, RSA 252:10. *Roberts v. Town of Hampton*, 115 N.H. 346, 341 A.2d 266 (1975); *Opinion of the Justices*, 93 N.H. 478, 39 A.2d 765 (1944); 11 E. McQuillin, Law of Municipal Corporations § 31.30 (3d ed. 1977).

█ █     A sewer rental fee is a continuous charge and is imposed because of one's use of the sewer system. *Opinion of the Justices*, 93 N.H. 478, 39 A.2d 765 (1944); 11 E. McQuillin *supra*. An assessment levy, on the other hand, is in the nature of a tax; it is incurred only once and is collected from a landowner who is specially benefited by the sewer's construction whether or not he is actually connected to the sewer system. 14 E. McQuillin, Law of Municipal Corporations §§ 38.01, 38.02, 38.113 (3d ed. 1970); Annot., 61 A.L.R.3d 1236, 1238 n.1 (1975). *See also Manchester v. Straw*, 86 N.H. 390, 169 A. 592 (1933). Whether or not a landowner uses the sewer system, his property is enhanced; hence, an assessment "tax" may be levied against the landowner for the benefit of adding this fixture. 14 E. McQuillin, *supra* §§ 38.02, 38.33, 38.113, 38.124, 38.128.

█     The city has established a scale of sewer rents by its ordinance. Manchester City Ordinances ch. 29, § 29-3. Under this chapter, a landowner is charged a service charge, which is a flat fee, and a user charge, which is computed on the per unit consumption of water and the volume and strength of wastewater discharge. *Id.* §§ 29-5, 29-6. For the period March 1976 to March 1977, it was stipulated that Seal Tanning owed approximately $75,000, and Waumbec owed

approximately $100,000 in sewer rental charges. These charges are rents and are determined by one's use of the sewer systems. These charges are not assessments; therefore, the city cannot levy them under the authority of RSA 252:9.

RSA 252:10 allows a city to establish a scale of sewer rents, and empowers the city with the authority to prescribe the manner and time of payment. Because of the statutory authority, the city argues that they can impose a rental fee even though plaintiffs are not connected to the city's sewer system.

It is true that RSA 252:10 grants the city expansive powers; nevertheless, the exercise of this power must be consistent with the initial grant. *Lavallee v. Britt*, 118 N.H. 131, 383 A.2d 709 (1978). The statute authorizes rental charges, but "the key to a valid rental charge is use." *Giesel v. City of Broadview Heights*, 14 Ohio Misc. 70, 236 N.E.2d 222, 226 (1968). We have previously considered the validity of sewer rental charges imposed under an act almost identical to RSA 252:10, and held that sewer rents "are charges for services rendered." *Opinion of the Justices*, 93 N.H. 478, 482, 39 A.2d 765, 787 (1944). *See also* E. McQuillin *supra; Jennings v. Walsh*, 214 Kan. 398, 521 P.2d 311 (1974); *Giesel v. City of Broadview Heights supra.*

We have held that municipalities have only those powers that are granted by the State. *Piper v. Meredith*, 110 N.H. 291, 295, 266 A.2d 103, 106 (1970). Therefore, the city of Manchester may only exercise that authority expressly or impliedly delegated to it by the legislature. *Id.;* RSA 47:17 XV. We hold that chapter 29 of the Manchester city ordinances which imposes sewer rents on the plaintiffs before their sewage facilities are connected to the city sewer system exceeds its source of authority and is therefore invalid. RSA 47:17 XV; *State v. Boisvert*, 117 N.H. 291, 371 A.2d 1182 (1977) (per curiam). *See also State v. Hutchins*, 117 N.H. 924, 380 A.2d 257 (1977).

In view of the result reached it is unnecessary to consider any of the other issues raised.

*Exceptions overruled.*

BOIS and BROCK, JJ., did not sit; the others concurred.