**STATE of Alaska et al., Appellants,**

**v.**

**The ALEUT CORPORATION et al.,**
**Appellees.**

**No. 2215.**

Supreme Court of Alaska.

Oct. 22, 1975.

James N. Reeves, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellants.

Donna C. Willard, of Gruenberg, Willard & Smith, Anchorage, for appellees.

Before RABINOWITZ, C. J., and ERWIN, BOOCHEVER and BURKE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This case raises the question of the validity of an auction sale of state lands in the Aleutian Islands. The central legal question, which has been characterized as "bristling with conundrums," involves interpretation of AS 38.05.305 which requires prior joint study and review of such sales with certain affected communities.

Between 1957 and 1963, the Territory and later State of Alaska foreclosed upon several parcels of land in the Aleutian Islands area. In the late 1960's, the State Division of Lands received inquiries from persons interested in purchasing the Aleutian properties. After an internal evaluation of the feasibility of the sale, the Division published notice that an auction of foreclosed lands in the Aleutian Recording District would be held if sufficient interest were expressed. This April 1971 notice was published in the Division's monthly public newsletter, with a mailing list circulation of over 3,000. In addition, the notice was mailed to 37 postmasters, four "clerks in charge," and seven "inhabitants" of the Aleutian Islands area. By the end of May 1971, the Division received 30 written expressions of interest.

The Division thereafter decided to proceed with the sale. Division employees conducted a field inspection of the parcels

between June 14 and June 18, 1971, during which they talked with several area residents, including the city manager of Unalaska and the president of the village of Chignik. The Division identified 16 separate parcels as salable; the total acreage involved was approximately 212 acres, with the parcels ranging in size from 1.54 acres to 86.38 acres.

Following final appraisal of the sale parcels,[1] the Division printed a brochure describing, in great detail, the sale procedure and the lands being offered. About September 1, 1972, the brochure was sent to the same postmasters, clerks in charge, and inhabitants of the Aleutian Islands area who had received the initial notice, as well as to those who had inquired about the sale and to 47 other postmasters throughout the state. Legal notice was also published in newspapers in Anchorage and Kodiak.

The auction of the parcels was set for September 27, 1972, in Cold Bay, Alaska. On the afternoon of September 26, the Aleut Corporation and the native villages of Sand Point, Squaw Harbor, and Unga obtained a temporary restraining order from the superior court halting the auction. The order was based on a finding that irreparable injury would be incurred by appellees if the sale were held, in view of appellees' rights to make future land selections in the area under the Alaska Native Claims Settlement Act (ANCSA).[2] The next morning an order was entered permitting the sale to proceed based upon a stipulation by the state that title to the parcels *would not be transferred to the successful bidders* until the state prevailed in the pending action. The auction was in fact held on September 27.

The pivotal issues in this litigation revolve around the construction and application of AS 38.05.305, which provides where pertinent:

> [N]o land in or adjacent to an incorporated municipality or other organized community may be sold or leased, or a renewal lease issued, until the proposed use of the land has been studied and reviewed jointly by the director and local authorized planning agencies.

In the superior court the native villages took the position that they were "other organized communities" under AS 38.05.305, and therefore the Director of the Division of Lands had an obligation to study and review with village authorities the proposed use of the Aleutian parcels before any sale could be held. Asserting that the required study and review requirements were not fulfilled, the native villages requested the superior court to set aside the sales.

The State of Alaska answered these contentions with four major counterarguments. The state contended that the native villages involved lacked the capacity to sue; that these villages were not "other organized communities" within the intendment of AS 38.05.305; that even if the villages could be characterized as coming within the ambit of "other organized communities", they had no existing "local authorized planning agency" with which the Director of Division of Lands could review the proposed land use; that none of the lands in question were "in or adjacent to" any of the villages.

After a non-jury trial, the superior court held that the native villages had standing to sue.[3] In interpreting AS 38.05.305, the superior court concluded that "other organized communities" presumptively includes

1. Appraisal is required by AS 38.05.310.

2. 43 U.S.C. § 1601 *et seq.* (Supp.1975). The action commenced by the Aleut Corporation and the native villages continued, with more villages and another regional corporation, the Bristol Bay Native Corporation, joining as plaintiffs.

3. Although the superior court did not explicitly rule on the issue of the native villages' legal capacity, we think the trial court's resolution of the standing question embodied an implicit recognition of the native villages' capacity to commence and maintain the instant litigation.

"native villages" as defined in section 3(c) of the Alaska Native Claims Settlement Act.[4] Analysis of the evidence led the trial court to find that "each of the communities involved . . . with the exception of 'Unga' represents a viable community sufficiently fixed in geographical space to permit communication with the State of Alaska."[5]

The "local authorized planning agency" language of AS 38.05.305 was interpreted to mean anyone authorized by the village so long as the Division of Lands is informed of the village's appointee sufficiently in advance of sale to permit joint review. Applying its construction of AS 38.05.305 to the sale of the lands involved in this litigation, the trial court enjoined the sale because the requisite "study and review" did not occur before the auction was held in Cold Bay. This appeal by the state followed.

Appellants' first point on appeal is that the trial court erred in finding that the "native villages" had capacity to sue in this action. Appellants have abandoned their contention made at trial that the Native Regional Corporations lack standing.[6] We note at the outset that Rule 17(c), Rules of Civil Procedure, states that "[a] partnership or other unincorporated association may sue or be sued in its common name." Thus, the mere fact that these villages are not incorporated under law does not render them incapable of suing; we must determine whether they possess the requisite qualifications to maintain a suit independently of their unincorporated status.

Traditionally, the question of capacity to sue or be sued has centered on the ability of a party to be accountable for the process and results of legal proceedings. Infants and incompetent persons, for instance, are generally barred from litigation except through a competent representative. Likewise, entities other than natural persons, such as businesses and associations, have been restricted to varying degrees except where the process of incorporation has devolved upon them the special status of a legal entity. In the case of unincorporated businesses and associations, the major difficulty in allowing participation in legal proceedings is a practical one, that of establishing one or more legal entities (persons or otherwise) who can be held responsible for the results of the process.

In the context of this case, the need for applying the capacity test is clear. At least one of the native villages listed as a plaintiff below, Unga, appears to have been uninhabited at the time the suit was

---

4. The Alaska Native Claims Settlement Act (ANCSA) is codified at 43 U.S.C. § 1601 *et seq.* (Supp.1975). ANCSA § 3(c) is found at 43 U.S.C. § 1602(c) (Supp.1975).

   In the process of construing AS 38.05.305, Judge Singleton rejected the state's thesis that he should defer to the Division of Lands' interpretation of AS 38.05.305 so long as the Division's interpretation has a rational basis. Concluding that interpretation of AS 38.05.305 does not involve the particular expertise of the Division of Lands, the superior court employed conventional judicial principles of statutory construction.

5. The trial court also concluded that all land properly withdrawn for a village under the provisions of the ANCSA is "in or adjacent to" the village for purposes of AS 38.05.305.

6. Appellees can be divided into two groups: Native Regional Corporations organized under the Alaska Native Claims Settlement Act, the Aleut Corporation and the Bristol Bay Native Corporation, and the "native villages" of Sand Point, Squaw Harbor, Unga, Unalaska, Akutan, False Pass, Nelson Lagoon, and Chignik. As to the former, both regional corporations are bona fide Alaska corporations incorporated pursuant to AS 10.05.005, pursuant to Section 7(d) of ANCSA. The capacity of these regional corporations to bring a legal action, and in particular the instant litigation, is not contested by the state.

   Concerning the second grouping of appellees, it is of significance that these native villages are suing as unincorporated native villages and not as "village corporations" under the ANCSA. As to this group, the state argues that the villages are merely names of places where people have chosen to live and hence lack right or power to maintain a legal action as an entity. The native villages contend that they have capacity to sue either as unincorporated associations or as "Indian tribes."

filed. The illusory nature of trying to hold that "village" responsible for the conduct and results of the lawsuit is obvious.[7]

■ When an unincorporated entity files a lawsuit, there must be some person or legal entity who can be held accountable for conduct of the suit. Thus, one court has characterized the minimal attributes of an unincorporated association as follows:

It is usually characterized by having by-laws governing its organization and operation, a stated purpose for its existence, and providing for its continuity though its membership may change. There should also be responsible officers elected according to the by-laws, whose duties and responsibilities may be ascertained and upon whom valid process may be had.[8]

Appellees here have offered evidence to show that the native villages possess these attributes. Aleut villages have historically had well-developed hierarchical organizations.

Dr. William S. Laughlin, an anthropologist and authority on Aleut culture, testified that the Aleuts had inhabited the Aleutian Chain for at least 8,500 years. According to Dr. Laughlin, the present total Aleut population of villages on the Aleutian Chain is 2,082 people. There are 15 distinct communities on the chain, and a majority of the communities have been located in approximately the same locations since 1741 when the Russians arrived. Prior to the Russian occupation of the Aletians, the Aleut communities were each governed by a single chief. The Russians subsequently introduced a three-chief village organization: the first chief handled external affairs; the second chief, internal affairs; the third chief was a messenger. Today, a modified three-chief form of civil government structure continues, although the titles have been changed to president and vice-president, with the offices often functioning in conjunction with a village council. Of the villages involved, Unalaska and Sand Point have regular city governments incorporated under state law; the rest have the traditional village government, except for the uninhabited town of Unga.

■ We believe that insofar as each appellee village has a firm governmental structure with identifiable officers, they possess the requisite permanence to be held accountable for the proceeding, and hence have the capacity to sue. Our holding applies to the native villages of Squaw Harbor, Akutan, False Pass, Nelson Lagoon, and Chignik.[9]

■ There is an additional problem with the "native villages" of Unalaska and Sand Point. Each of these communities is incorporated as a city under the laws of Alaska, and each has a regular city government. Nonetheless, the lawsuit was instituted on behalf of the "native villages" bearing those names, not on behalf of the cities. When the traditional village government has been superceded by a city government operating pursuant to state law, the city government becomes the sole representative of the community for protecting rights granted to the community as a whole.[10] The record does not reflect who precisely authorized the filing of the suit on behalf of those communities, whether city officials or others in the community.

---

7. The need to hold all parties accountable for results of a lawsuit is of particular significance in Alaska, where costs and fees may be assessed against the non-prevailing party.

8. *Hidden Lake Dev. Co. v. District Court*, 515 P.2d 632 (Colo.1973).

9. We are assuming, in the absence of evidence in the record to the contrary, that inclusion as plaintiffs below has been authorized by the civil authorities of each appellee village.

The filing of a suit not authorized by the named plaintiff would constitute a breach of statutory law (*see* AS 22.20.050–.070) and of professional ethics.

10. One alternative of this reading would be to consider this suit as in the nature of a class action on behalf of all individuals in the community. Nothing in the pleadings or record below indicates an intention to proceed with the suit in this fashion.

Based on the pleadings alone, we hold the "native villages" of Unalaska and Sand Point to be without capacity to sue in this case.[11] Thus, we conclude that all of the "native village" plaintiffs below possessed capacity to sue in this matter, with the exception of Unga, Unalaska, and Sand Point.

Turning to the major substantive issues in this appeal, we must determine whether the Division of Lands complied with the requirements of AS 38.05.305 prior to conducting the Public Land Auction in question here.

The state takes the position that its Division of Lands has consistently interpreted "adjacent to", as used in AS 38.05.305,[12] to mean "located in [such] proximity to the community [that] . . . disposal of that land would in some manner have an influence on private or community owned lands which are being developed or used in the area." According to the Division, the phrase "other organized community" refers to boroughs, and "local authorized planning agencies" is synonymous with "local planning and zoning commissions."

The state further contends that this court must limit its inquiry here to whether there is a reasonable basis for the agency's interpretation of AS 38.05.305. This court has used the reasonable basis test in the past when an administrative agency's interpretation of law falls within that agency's particular area of expertise.[13] As was noted in *Kelly v. Zamarello*,[14]

[w]e believe that the reasonable basis approach should be used for the most part in cases concerning administrative expertise as to either complex subject matter or fundamental policy formulations.

■■ On the other hand, when determining questions of whether proper procedures were observed, whether the administrative agency has acted within the scope of its authority, or whether an agency's interpretation of regulations is consistent with the statutes on which they are based, we are not faced with problems involving specialized knowledge or administrative expertise. Our opinion in *Mukluk Freight Lines, Inc. v. Nabors Alaska Drilling, Inc.,* 516 P.2d 408 (Alaska 1973), is illustrative of this latter approach. In *Mukluk,* we were called upon to decide if the Transportation Commission's procedures were consistent with due process constraints. In rejecting the reasonable basis standard of review, Justice Fitzgerald, writing for the court, said:

The controlling factors in this case weigh heavily against application of the reasonable basis test to the issues now under consideration. Those issues appear to have little to do with the Commission's expertise or particularized knowledge. Instead they concern constitutional and statutory interpretations requiring the special competency of the courts.[15]

---

11. No remand will be required for a determination of who authorized the suit on behalf of the two communities, because such a remand would be a needless exercise. Since most appellees do have capacity, the suit itself is not moot, and because the terms of our decision in this case impose a statutory duty to communities in the position of Unalaska and Sand Point, those cities will receive the full benefit of the adjudication in the case at bar.

12. This statute was enacted pursuant to Article VIII, Section 10, of the Alaska Constitution which provides:
   No disposals or leases of state lands, or interests therein, shall be made without

prior public notice and other safeguards of the public interest as may be prescribed by law.

13. *See Jager v. State,* 537 P.2d 1110 (Alaska 1975) ; *Mobil Oil Corp. v. Local Boundary Comm'n,* 518 P.2d 92 (Alaska 1974) ; *Swindel v. Kelly,* 499 P.2d 291 (Alaska 1971) ; *Kelly v. Zamarello,* 486 P.2d 906 (Alaska 1971) ; *K & L Distributors v. Murkowski,* 486 P.2d 351 (Alaska 1971) ; *Pan American Petroleum Corp. v. Shell Oil Co.,* 455 P.2d 12 (Alaska 1969).

14. 486 P.2d 906, 917 (Alaska 1971).

15. 516 P.2d at 412. *See Jager v. State,* 537 P.2d 1110 (Alaska 1975).

■ In the instant case we find no reason not to use conventional review and construction techniques as to the meaning of the statute at issue. The terms of AS 38.05.305 are not technical, and mere familiarity in their application by the Division of Lands does not render that agency any better able to discern the intent of the legislature than the courts. We will therefore apply our own independent judgment as to whether the agency's interpretation complies with the legislature's intent.

■ Turning to the question of the proper meaning of AS 38.05.305, we note that the statute applies only to "an incorporated municipality or other organized community." The state contends that the phrase "other organized community" refers only to boroughs, and cannot be read so as to encompass unincorporated villages. This reading stems in part from another phrase in the statute, "local authorized planning agencies." The state reasons that AS 38.05.305 must be read as limited to communities with duly created planning agencies with the power to plan and zone. Since such powers are limited to incorporated municipalities and boroughs, the phrase "other organized community" must refer, according to the state's analysis, only to boroughs.

In our view, the state's reading of AS 38.05.305 is too constricted. Common sense leads to the conclusion that if the legislature had intended to limit the provision's applicability to incorporated municipalities and boroughs, it would have used the word "boroughs." We think the legislature employed the broader term "other organized community" for the purpose of importing flexibility into the statute. Since the forms and powers of local governments in Alaska are not immutable, the broader term serves the purpose of imposing the duty in regard to the intended class of communities regardless of how the form of local government changes over the years. And we further believe that the legislature intended AS 38.05.305 to apply to communities, like the villages in this case, which have permanent populations and an organized civil government, even though that government is a product of cultured tradition rather than incorporation under state laws.[16]

■ We also believe that the state's interpretation of "local authorized planning agencies" to be overly narrow. Given our reading of the phrase "other organized community," it is clear that the "planning agencies" cannot be limited to the agencies authorized by statute to provide technical planning services to certain classes of communities. We read the phrase "local authorized planning agencies" as referring to whatever persons or agencies are charged

We recognize the long-standing principle of statutory interpretation that special consideration will be given to the interpretations of the agency charged with administering the statute; however, the administrative agency's interpretation is not controlling when this court is in as good a position as the agency to decide on the meaning of particular statutes. *See, e. g., Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

16. The trial court found that a village is an organized community under AS 38.05.305 if it has an active government, whether by paramount chief or village council, or some combination thereof and has at least 25 members. This test is partially derived from the definition contained in the Alaska Native Claims Settlement Act, 43 U.S.C. § 1602(c) (Supp.1975). The court also noted that the traditional economic organization of the Aleut people gives them a somewhat nomadic existence during the summer. It concluded, and we agree, that this fact does not lessen their status as a viable organized community for the purposes of AS 38.05.305.

Appellees in part rely on the definition of "organized" as found in *City of Beaumont v. City of Beaumont Independent School District*, 164 S.W.2d 753, 757 (Tex.Civ.App. 1942). There the court defined "organized" to mean "[t]o establish or furnish with organs; to systematize; to put into working order; to arrange in order for the normal exercise of its appropriate functions." For a definition of "community," appellees have cited the definition found in Black's Law Dictionary, at 350 (4th Ed.). In this work, "community" is defined as "a society or body of people living in the same place, under the same laws and regulations, who have 'common rights, privileges or interests.'"

by the government of the community with the task of overseeing the physical growth of the community, particularly land use. In smaller communities, this function may be performed by the village mayor or chief or by the village council. The fact that a community has not delegated its planning functions to a body specially created for that purpose does not absolve the state of its duty to study and review prospective land sales with that community.

From a study of the record, one can conclude that the Aleut Corporation and the Bristol Bay Native Corporation entered this litigation in order to enforce both their own rights and those of the villages located within their regional boundaries. Without addressing the question outright, the trial court appears to have decided that they were not themselves an "unincorporated municipality or other organized community" within the meaning of AS 38.-05.305.[17] We are inclined towards agreement with this conclusion. Although native corporations may perform certain quasi-governmental functions in parts of Alaska, they are not government organs in the sense of political bodies elected by all the citizens of voting age in a given area with regular governmental authority over all the inhabitants. Native regional corporations, in their capacity as private business corporations, may have interests, actual or potential, in land use contrary to those of other affected persons who are not corporation members. This is not to say that a village government could not delegate certain municipal planning functions to a regional corporation, or appoint corporation planners as their representatives for the

purpose of consultations with the state pursuant to AS 38.05.305. In such instances, the regional corporation would simply be exercising the rights of the villages, rather than its own.

We turn next to the meaning of the phrase "land in or adjacent to" an incorporated municipality or other organized community. The trial court defined such land as including "all land which has been withdrawn under the [Alaska Native Claims Settlement Act] with regard to a specific village."[18] The state points out, however, that the village withdrawals under ANCSA were not completed as of the date of the questioned auction, so that it was impossible for the state to have complied with the trial court's decision. Moreover, ANCSA provides for certain "deficiency withdrawals" when there is insufficient land contiguous to a village available for selection; such villages may make the remainder of their land selections from available land elsewhere in that region.[19] Thus, at least until such time as all ANCSA claims have been completed and patented, many villages would have to be consulted in regard to land sales anywhere within the region.

We think there is only limited value in trying to tie the definition of "in or adjacent to" closely to the provisions of ANCSA. For one thing, the provisions of AS 38.05.305 predate ANCSA,[20] so the legislature could not have intended any such automatic intermeshing of the two statutes. Moreover, it is a two limiting assumption that village interests in the use and disposal of adjacent lands will inevitably correspond to village land selections.[21]

---

17. In ruling on Aleut Corporation's standing, the trial court found standing due to the corporation's "legitimate interest in asserting the rights of the native villages which, under the federal land claims settlement, fall within their sphere of influence." Moreover, the court's decision and explanation of the requirements of AS 38.05.305 were made in reference to the native village plaintiffs alone.

18. *See* 43 U.S.C. § 1611 *et seq.* (Supp.1975).

19. *See* 43 U.S.C. § 1610(a)(3) (Supp.1975).

20. AS 38.05.305 and other statutory provisions regulating the sale or lease of state lands were, for the most part, enacted in 1959. ANCSA became law in December 1971.

21. We also note that a definition in terms of ANCSA withdrawals, while arguably pertinent to the villages here, would not aid in determining the state's responsibilities regarding communities which are not "native villages" under ANCSA.

The state has urged us to adopt instead the definition of "adjacency" consistently employed by the Division of Lands, "located in [such] proximity to the community [that] . . . disposal of that land would in some manner have an influence on private or community owned lands which are being developed or used in the area." This definition, while closer to the usual meaning of "adjacency" than one based on ANCSA selections, may still be too restrictive to comport with the intentions of the legislature in AS 38.05.305. The state's definition adds an extra element, namely, that the proposed lease or sale would affect other lands in the area, either private or community-owned. The proposition that a community's legitimate interest in sales of state lands is limited to the effect of such sales on other properties in the area is unacceptable. Land use by rural Alaskan communities is rarely limited to land owned either privately or by the community itself. Testimony in this case offers ample evidence that the economic patterns of Aleut communities in particular include utilization of state-owned lands for subsistence purposes.[22] Thus, we conclude that it would be a misreading of AS 38.05.-305 to deny its applicability to lands which are actively utilized by the community, but where sales would have no direct effect on other, privately and community-owned, lands. We hold that lands "in or adjacent to" a community are lands which are in fact utilized on a regular or periodic basis by members of the community for legitimate economic or recreational purposes and are located within a reasonable distance of the village. Further, we conclude from the record that all of the native villages remaining as parties do in fact fall within this definition of adjacency in regard to at least some of the lands at issue here.[23]

Finally, the meaning of the requirement of joint "study and review" prior to land sales under AS 38.05.305 must be considered. The trial court concluded that joint study and review was intended to insure (1) reasonable notification of intent to sell or lease, with a description of the land and the sale or lease terms; and (2) solicitation of the views of the villages sufficiently in advance of the sale or lease to enable (3) discussions between the Division and a village's appointed representative or chief officer.

We agree with the superior court's decision that notice to the communities to whom AS 38.05.305 is applicable is necessary. The notice must be in addition to whatever notice is provided to the general public through Division publications, and must be sent to the person charged with planning authority or to the chief executive in each community. The notice must describe the proposed sale or lease and the land sufficiently that the community representative can intelligently study, review, and comment on the subject. The notice must also inform the community of its right under AS 38.05.305 to respond by written comment concerning the proposed sale or lease, and that Division personnel will hold a hearing in the community if the community requests. All of the foregoing requirements must be met sufficiently in advance of the proposed date of the sale or lease to allow the Division to react to community comments by modifying, delaying, or cancelling the sale or lease·if it deems such action advisable.[24]

---

22. Dr. Laughlin testified that the land within a six-mile radius of a base village would be used in connection with subsistence food-gathering activity. The six-mile radius is a conservative minimum average based on a model utilizing as its basic measure the distance a 72-year old woman can walk in a day and still get back before dark. From the base village, the residents could, at certain times of the year, move to hunting and fishing camps. In his testimony, Dr. Laughlin also indicated the primary hunting, fish-ing, and food-gathering sites, as well as the historic burial and archaeological sites of the villages involved.

23. The evidence supports appellees' statement that "[t]he hunting and fishing camps, village sites and the historical burial and archaeological sites encompass all the parcels involved in the sale . . . . ."

24. We agree with the trial court, however, that AS 38.05.305 does not give the communities to which it applies a veto over pro-

In the instant case, while certain members of the village communities may have had actual notice of the proposed sale, there is an absence of evidence to indicate that the state has even approached the level of notice and opportunity for comment which we consider mandated by AS 38.05.-305. To the extent that the sales were studied and reviewed by the Division and community leaders, such study and review was haphazard and occurred only incidentally to the Division's preparations for the sale. We therefore affirm the superior court's conclusion that the auction sale at issue here was conducted in contravention of AS 38.05.305 and that auction was of no legal force and effect.[25]

Affirmed.

CONNOR, J., not participating.

posed sales and leases. While the Division must actually consider the communities' comments, the final decision is still committed to that agency's discretion.

25. Applying the criteria adopted in *Schreiner v. Fruit*, 519 P.2d 462, 466–67 (Alaska 1974),

we hold that the interpretation of AS 38.05.-305 is to be accorded solely prospective application. It is open to the Division of Lands to diminish areas of vagueness and uncertainty inherent in the present wording of AS 38.05.305 through its rule-making powers or by seeking amendatory legislation.