ALASKA PUBLIC UTILITIES COMMISSION et al., Appellants,

v.

MUNICIPALITY OF ANCHORAGE, a Municipal Corporation, Appellee.

No. 2940.

Supreme Court of Alaska.

Oct. 11, 1976.

Jeffrey B. Lowenfels, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellants.

Roger R. Kemppel, Kemppel & Huffman, Anchorage, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

BOOCHEVER, Chief Justice.

This appeal concerns the extent of the authority of the Alaska Public Utility Commission ("Commission") to regulate ·and set rates of a municipally owned public utility. It arises out of the Commission's denial of a rate increase requested· by the Municipal Light & Power Department of Anchorage ("M. L. & P.") for the purpose of generating adequate revenues to assure payment of amounts to become due under a proposed bond issue.

The Municipality of Anchorage ·("Municipality") filed a complaint in the superior court asking for a permanent injunction and declaratory relief, which was eventually granted. It contended that the Commission ¡generally had no authority to deny a rate increase where the purpose of the rate increase was to prevent the breaching of bond covenants regarding rates and also that the Commission did not have the authority to deny the specific rate increase requested, which was necessary to generate adequate·debt service coverage for proposed bond covenants.

The proposed bonds were to contain a provision that rates will generate at least 1.4 times the principal and interest due each year on all bonded indebtedness after necessary expenses of maintenance and operation of the system have been paid, but before depreciation. The last sentence of AS 42.05.431 ("Power of commission to fix rates") states:

A municipality may covenant with bond purchasers regarding rates of a municipally owned utility, and the covenant is

valid and enforceable and is considered to be a contract with the holders from time to time of the bonds.

The superior court held that the above section required the Commission to set rates to meet the covenants. This appeal followed and was handled by this court on an expedited basis due to an alleged urgent need for a decision so that it could be determined whether funding for improvements could be obtained. On June 11, 1976, we issued a decision and order (see Appendix 1) which, inter alia, provided that in advance of issuance of bonds, the Commission is not required to grant a rate which may be necessary to meet future bond requirements, but that the Commission must honor covenants contained in revenue bonds actually sold. That is, after there are existing contracts with bondholders, the covenants contained in the bonds must be honored by the Commission. We indicated in our order that an opinion would follow explaining the reasons for our decision.

The case arose when M. L. & P. filed a request on December 15, 1975 for a permanent rate increase of 51.75 percent of the rates in effect prior to July 8, 1975. Before the Commission, M. L. & P. argued that

present and future construction had to be financed by marketing a revenue bond issue of $11,000,000.00. It contended that the rates had to be increased by 51.75 percent in order to generate an adequate debt service coverage, equal at least to 1.4 times the annual amount required for payment of principal and interest on the bonds, in order to sell the bonds. M. L. & P. argued that the Commission had no discretion under AS 42.05 and was required to set rates to insure such bond coverage not only for existing bonds, but also so that M. L. & P. could enter into covenants required by the bond market before future bonds are issued.

The Commission, in Order No. 7, denied the full 51.57 percent rate increase requested, although an increase of 35.10 percent of rates charged prior to July 8, 1975 was granted. On March 12, 1976, after the Commission had failed to act on its petition for reconsideration, the Municipality filed a "Complaint for Declaratory Judgment and Permanent Injunctive Relief", alleging among other things, that the Commission incorrectly interpreted AS 42.05.431 "as not compelling the Commission to respect valid existing contracts between the Municipality and its bondholders." [1]

1. In addition to the other issues raised on this appeal, the Commission challenged the procedure used by the Municipality to gain judicial review.

The action for declaratory relief is clearly allowable. A declaratory judgment is appropriate when it affords relief from uncertainty and insecurity with respect to rights, status and other legal relations between the parties. *Jefferson v. Asplund*, 458 P.2d 995, 997-98 (Alaska 1969).

Here, the Municipality was asking for judicial clarification of an ambiguity that was raised by the wording of Commission Order No. 7. In the order denying a rate increase allegedly necessary to market the proposed bonds, the Commission used language which might indicate that it did not believe that it had to raise rates even to meet covenants in existing bonds. This ambiguity would have caused substantial problems in the sale of Alaska municipal bonds. The Municipality wanted a judicial declaration of the legal status of existing covenants and their effect on the Commission's rate-setting powers

in light of AS 42.05.431; thus an action for declaratory judgment was proper.

The Municipality also brought an action for injunctive relief, essentially asking the court to overturn the Commission's denial of the specific rate increase requested. The Commission challenged the jurisdiction of the trial court, arguing that the proper method for obtaining review was an appeal from the Commission's order and contending that the time for bringing an appeal from such an administrative decision had passed.

The jurisdictional attack would be troublesome if the time for bringing an appeal had passed. Here the Commission was incorrect in its assertion that the time for bringing an appeal had passed, so that there was no time barrier preventing the court from treating the request for injunctive relief seeking to overturn the Commission's denial of the specific rate increase as an appeal. Under Appellate Rule 46, in the interest of justice, we have often treated actions as if they were properly brought. *See e. g., Breese v. Smith*, 501 P.2d 159, 163 (Alaska 1972); *Hoffman*

On April 20, 1976, the superior court granted the permanent injunction and declared that:

AS 42.05, including AS 42.05.431, requires the defendants to fix rates for municipally owned utilities which are necessary to provide adequate coverage for covenants which the Municipality may enter into from time to time with future bondholders.

The court found that:

1. The Commission used the revenue requirements approach and refused to be bound by the bond coverage covenants;

2. The City relied on AS 42.05.431 in issuing the bonds;

3. The proposed new construction was necessary and desirable;

4. The traditional method of financing such construction is the sale of tax-exempt revenue bonds;

5. The bonds, in order to sell, must contain a coverage covenant that is "meaningful, unequivocal, and absolute", and must be supported by a "clean opinion" from the Municipality's bond counsel;

6. The Commission's action prevented issuance of such a clean opinion;

7. This action not only affected the proposed bond issue, but also "would have a drastic effect on all municipal bonding, and to a certain degree on state bonds"; and

8. The harm would be immediate and would affect the Municipality and electrical consumers in the Anchorage area since the power system would be in danger of being unable to meet increasing demands, creating a greater likelihood of system failures and various forms of power outages.

The Commission appealed from the judgment of the superior court. In order to evaluate properly the questions raised by this appeal, it is necessary to review the history of AS 42.05.431 since its construction is at the core of the issues presented for review. The first Alaska Public Service Commission Act became law in 1959 and included municipal utilities within its coverage, Ch. 199, sec. 3(1), SLA 1959, AS 42.05.640(2). In 1963, the legislature specifically excluded municipal utilities from the regulatory powers of the Commission, leaving it with jurisdiction over privately owned public utilities only,[2] Ch. 95, sec. 2, SLA 1963, amending AS 42.05.640(2). Conflicts subsequently arose between municipally owned utilities and other utilities concerning routes that would be utilized and customers that would be served. Two of those conflicts terminated in decisions by this court, namely, *Chugach Electric Ass'n v. City of Anchorage*, 426 P.2d 1001 (Alaska 1967), and *Homer Electric Ass'n v. City of Kenai*, 423 P.2d 285 (Alaska 1967). In the opinions in each of those appeals, the court urged passage of legislation pertaining to the relationship between municipal utilities and utilities regulated by the Public Utilities Commission, 426 P.2d at 1004–05; 423 P.2d at 290. Obviously, when utilities duplicate services, the unnecessary cost is reflected in higher rates to the customers. In responding to this problem, in 1970, the legislature elected, with one significant exception,[3] to subject municipally owned utilities which were in competition with other utilities to the full gamut of regulation which pertained to other utilities.[4]

---

*v. State*, 404 P.2d 644, 647 (Alaska 1965); *Jefferson v. Spenard Builder's Supply, Inc.*, 366 P.2d 714, 716 (Alaska 1961); *Stokes v. Van Seventer*, 355 P.2d 594, 596 (Alaska 1960). While under the facts of this case .the result is the same as if the matter had been presented to the superior court as an appeal, generally an administrative appeal, such as that involved here, should be filed in accordance with Appellate Rule 45.

2. This appears to be the system followed in almost all other states.

3. The exception is set forth in the last sentence of AS 42.05.431, appearing elsewhere in this opinion.

4. AS 42.05.141 provides:
   The Alaska Public Utilities Commission may (1) regulate every public utility engaged or proposing to engage in such a business inside the state, except to the ex-

Normally, the need for regulation of privately owned public utilities is quite distinct from any need to regulate municipally owned utilities. Both are usually granted a monopoly or at least a partial monopoly for service in certain areas. Without regulation, there would be no control by normal economic competition over the rates charged and the type of service furnished by a privately owned utility. In the case of a municipally owned utility, however, there is a governmental body elected by the people which has the primary responsibility in regard to the operation of the utilities and the rates charged for services. In Alaska, nevertheless, the Public Utilities Commission has been granted the same powers to regulate and control non-exempted municipal utilities as other utilities with the exception of the portion of AS 42.05.-431 which states:

> A municipality may covenant with bond purchasers regarding rates of a municipally owned utility, and the covenant is valid and enforceable and is considered to be a contract with the holders from time to time of the bonds.

Thus it is the construction of that provision and its relationship to the broad general regulatory powers of the Commission which must be determined in this case.

With reference to the standard to be applied in reviewing its order, the Commission argues that this case involves a complex subject matter and fundamental policy formulation so that its decisions should be reviewed under the "reasonable basis" test: when there is a reasonable basis for the Commission's interpretation of the statute it must be upheld.[5] The Commission argues that the reasonable basis test must be applied here since an administrative agency's interpretation of part of the statute pursuant to which it operates falls within the agency's particular area of expertise.

In *Kelly v. Zamarello,* 486 P.2d 906, 917 (Alaska 1971), we stated that "the reasonable basis approach should be used for the most part in cases concerning administrative expertise as to either complex subject matter or fundamental policy formulations." Where, however, the question at issue concerns constitutional or statutory interpretations having little to do with the Commission's expertise or particularized knowledge, it is considered to fall into the realm of special competency of the courts.[6] Here, as in *State v. Aleut Corp.,*[7] we find no reason not to use conventional review and construction techniques as to the meaning of the statute at issue. The question presented for review here is whether AS 42.05.431 limits the statutory authority of the Commission to regulate rates when present or proposed bond covenants are involved. This is primarily a question of statutory interpretation and legislative intent. It is a question of whether "the administrative agency has acted within the scope of its authority"[8] and concerns "statutory interpretations requiring the special competency of the courts".[9] Therefore, the reasonable basis test is not the appropriate standard of review.

---

tent exempted by § 711 of the chapter and the powers of the commission shall be liberally construed to accomplish its stated purposes[.]

AS 42.05.711 establishes exemptions from the provisions of an Alaska Public Utilities Commission Act and specifies in part:

(b) Public utilities owned and operated by a political subdivision of the state and none of whose utilities, excepting the furnishing of collection and disposal service of garbage, refuse, trash or other waste material, is in competition with any other utility, are exempt from the provisions of this chapter, other than the provisions of §§ 221–281 of this chapter, unless the owner and operator elects to be subject to all the provisions of this chapter. . . .

5. *E. g., State v. Aleut Corp.,* 541 P.2d 730, 736 (Alaska 1975).

6. *Mukluk Freight Lines, Inc. v. Nabors Alaska Drilling, Inc.,* 516 P.2d 408, 412 (Alaska 1973).

7. 541 P.2d 730, 736 (Alaska 1975).

8. *Id.*

9. *Mukluk Freight Lines, Inc. v. Nabors Alaska Drilling, Inc., supra,* 516 P.2d at 412.

The two questions[10] presented by this appeal are: 1) does AS 42.05.431 require the Commission to set rates so as to assure that existing bond covenants are met; and 2) does that statute require the Commission to set rates so as to allow the municipality to market proposed bonds (bonds which have not yet been sold).

As to existing bonds, i. e., those bonds which have actually been marketed and for which there are present purchasers or holders, AS 42.05.431 requires that the Commission set rates so as to assure that bond covenants will not be breached. For example, the municipal bond covenants usually provide that:

> The City has further bound itself to . . establish, maintain and collect rates and charges for electric utility service that will provide revenues equal to at least 1.4 times the amount required each calendar year hereafter to pay the principal of and interest on the bonds of this issue and all electrical utility bonds of the city which have an equal lien on the revenues or the monies in the Electric Utility Fund after necessary expenses of maintenance and operation of said systems have been paid but before depreciation.

The Commission must set the rates and charges at a level that assures the 1.4 ratio will be met for those bonds, not only immediately after the time the bonds are issued, but also over the lifetime of those bonds. Also, in the event the bonds are sold in the future, the covenants in those bonds pertaining to rates will then become enforceable.[11]

Although the Commission's position on this issue prior to oral argument on this appeal was unclear, it conceded during oral argument that it was required to set rates necessary to meet the covenants of bonds that are sold. Even absent such a concession, the clear wording of AS 42.05.431 requires that result. If the Commission had the unfettered power to set rates, then it could not be forced to raise rates even in the face of breached covenants. AS 42.-05.431, however, specifically provides that the covenants are "valid and enforceable". Since the Commission's approval of a certain rate is necessary, the covenants must be honored by the Commission; otherwise there would be no enforceability of the covenants. The plain meaning of AS 42.05.431 requires that once the bonds are actually purchased, and actual bond purchasers and holders exist, the covenants are valid and enforceable. The validity of the bond covenants thus requires the Commission to respect the provisions of the covenants, and insure that they will not be breached.

The plain meaning of AS 42.05.431 also resolves the second issue in this appeal. In order to fully understand this issue, a short summary of the procedures in bond marketing is necessary.

First, following a public hearing, an ordinance is passed by the municipality authorizing the sale of the proposed bonds. The ordinance contains provisions for bond covenants and also provides that at the time of the issuance, the municipality will have on file a certificate by an independent consulting engineer showing that in his professional opinion, the annual income available for revenue bond debt service is equal to the covenanted amount, in this instance, 1.4 times the annual principal and interest payments; and that such rates have been in existence for at least a month before the sale. The bond counsel for the municipality approves the engineer's certificate and every other step of the procedure. After the passage of the ordinance, bids are requested from financial institutions. A "clean" opinion from bond counsel about the availability of debt service coverage is

---

10. The municipality also contended that the Commission was interfering with the municipality's right to select the most appropriate means of financing municipal activities. Since no such order was issued by the Commission, we do not pass on that issue.

11. The Commission has issued no regulations requiring the prior approval of proposed bond issues.

**268**

crucial to the marketability of the bonds. Once a bid is accepted, the bonds are printed and signed. Cash is then transferred to the municipality.

Thus the practical realities of the bond market require that there must be an assurance that the covenanted multiple of principal and interest due will be available in rates and charges, and such assurance must be on record at the time of the delivery of the bonds. Therefore, if the present rates and charges are not adequate to meet the covenants for the years covered by the proposed bonds, the municipality must secure a Commission order to set the rates and charges at a suitably increased level prior to the actual issuance of the bonds. The Commission, by refusing such a requested rate increase, may destroy the marketability of those bonds.

The question here is whether the Commission must automatically allow a rate increase in order to assure the marketability of a proposed bond issue. Again, AS 42.-05.431 states:

> A municipality may covenant with bond purchasers regarding rates of a municipally owned utility, and the covenant is valid and enforceable and is considered to be a contract with the holders from time to time of the bonds.

Until there is an existing covenant with bond purchasers, there is nothing which is valid and enforceable, and therefore nothing to interfere with the Commission's general rate-setting authority. An existing covenant requires two parties, and until the municipality's bonds have actual purchasers or holders, no covenant is in existence. Therefore, prior to the issuance of bonds, the Commission is not required by the statute to set a rate which would meet the revenue requirements which would be necessary under the covenants if the bonds were sold.

The judgment of the superior court is affirmed in part and reversed in part.

## DECISION AND ORDER

On December 15, 1975, the Municipality of Anchorage, doing business as Municipal Light and Power Department (M L & P), applied to the Alaska Public Utilities Commission (PUC) for a rate increase of 51.75 percent above the rates in existence prior to July 8, 1975. The PUC had previously granted interim increases of 29.72 percent.

The Municipality contended that in order to generate an adequate debt service coverage so as to enable it to sell bonds, the rates had to be increased by 51.75 percent, and that the PUC had no discretion to refuse such a rate increase.

The PUC rejected M L & P's request for the reason, inter alia, that it would be discriminatory and unreasonable to require rate payers to pay rates based on improvements which could not be constructed for several years. The PUC agreed that the facilities are necessary for M L & P to maintain an adequate level of service.

Thereafter, the Municipality of Anchorage filed a "Complaint for Declaratory Judgment and Permanent Injunctive Relief", requesting in part that:

A. The court declare that AS 42.05.431 does not authorize the PUC to deny rate increases which would force the Municipality to breach its contracts with existing bondholders;

B. AS 42.05.431 requires the PUC to fix rates for municipal utilities which are necessary to provide adequate coverage for covenants which the Municipality may enter into from time to time with future bondholders, and

C. The PUC be permanently enjoined from interfering with the Municipality's right to select the most appropriate means of financing municipal utilities.

The Superior Court in a Memorandum Decision and Order declared that AS 42.-05, including AS 42.05.431, requires the PUC to fix rates for municipally owned utilities which are necessary to provide adequate coverage for covenants which the

Municipality may enter into from time to time with future bondholders and enjoined the PUC from refusing to grant rates necessary to cover adequately covenants which the Municipality may make from time to time with future bondholders. On May 11, 1976, the PUC appealed from the Superior Court's order. Due to the importance of this matter, the appeal has been expedited.

This matter came on for hearing before the court on June 9, 1976, and briefs having been filed and arguments heard and it appearing to the court that it is urgent that a decision be rendered at once, the court hereby makes and enters the following decision:

1. In the procedural context of this case, the Superior Court properly exercised jurisdiction of this matter and was authorized to render a decision.

2. AS 42.05.431 which provides in part:

A municipality may covenant with bond purchasers regarding rates of a municipally owned utility, and the covenant is valid and enforceable and is considered to be a contract with the holders from time to time of the bonds.

compels the establishment of rates for a municipally owned utility sufficient to comply with covenants contained in existing contracts with bond purchasers and holders of bonds.

3. In advance of the issuance of bonds, the Public Utilities Commission is not required by the statute to grant a rate which may be necessary to meet future bond requirements.

4. In the absence of a regulation requiring prior submission for approval of a proposed bond issue, the Public Utilities Commission must honor covenants contained in revenue bonds which are sold in the future. That is, after there are existing contracts with bond purchasers or bondholders, the covenants entered into with the bond purchasers or bondholders must be honored by the Public Utility Commission.

5. The PUC has not entered any order interfering with the Municipality's right to select the most appropriate means of financing municipal activities, and we do not pass on the question of the powers of the PUC in that respect.

The order of the Superior Court is affirmed in part and reversed in part as indicated in this Decision which is prefatory to a full opinion to be filed at a later date. While a majority of the court is in agreement as to each portion of this Decision, individual justices may file dissents as to particular portions hereof.

By direction of the Court.