Public Utilities Commission
No. 98-114

IN RE NEW HAMPSHIRE PUBLIC UTILITIES COMMISSION
STATEWIDE ELECTRIC UTILITY RESTRUCTURING PLAN

December 23, 1998

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Martin L. Gross* on the brief and orally), *Day, Berry & Howard LLP*, of Hartford, Connecticut (*Allan B. Taylor* on the brief), and *Robert A. Bersak*, assistant general counsel of Public Service Company of New Hampshire, of Manchester, by brief, for Public Service Company of New Hampshire.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief) and *Backus, Meyer, Solomon, Rood & Branch*, of Manchester (*Robert A. Backus* orally), for Campaign for Ratepayers Rights.

*Michael W. Holmes*, consumer advocate (*Mr. Holmes* and *James R. Anderson*, assistant consumer advocate, on the brief), for Office of Consumer Advocate.

*O'Neill, Grills & O'Neill, P.L.L.P.*, of St. Paul, Minnesota (*Peter H. Grills & a.* on the brief) and *Thomas I. Arnold, III*, assistant city solicitor, by brief, for the City of Manchester.

*Philip T. McLaughlin*, attorney general (*Martin P. Honigberg*, senior assistant attorney general, on the brief and orally) and *Foley, Hoag & Eliot, LLP*, of Boston, Massachusetts (*James K. Brown* on the brief), for the State.

*Morrison & Foerster LLP*, of Washington, D.C. (*Robert H. Loeffler* on the brief and orally) for Cabletron Systems, Inc. & a.

THAYER, J. This is an interlocutory transfer without ruling requested by the New Hampshire Public Utilities Commission (PUC) pursuant to RSA 365:20 (1995) and Supreme Court Rule 9. The questions presented, as modified at a pre-hearing evaluation conference, are as follows:

> 1. Does Public Service Company of New Hampshire have any rights under the Rate Agreement and/or RSA chapter 362-C which must be recognized by the public utilities commission in establishing stranded cost charges under RSA chapter 374-F?
> 2. If the answer to question #1 is "yes," may the public utilities commission establish stranded cost charges providing for less than full recovery of the assets referred to in the Rate Agreement?

We answer both questions in the affirmative with the limitations provided herein.

This case has an arduous history. Much of the case background can be found in *Petition of Public Service Co. of New Hampshire*, 130 N.H. 265, 539 A.2d 263 (1988), *appeal dismissed*, 488 U.S. 1035 (1989), and *Appeal of Richards*, 134 N.H. 148, 590 A.2d 586, *cert. denied*, 502 U.S. 899 (1991). We recite only the facts relevant to the present matter as offered in the interlocutory transfer.

On January 28, 1988, Public Service Company of New Hampshire (PSNH), which provides electric generation, transmission, and distribution services, and is the State's largest public utility, filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. PSNH intended to use the reorganization process as a means of salvaging its investment in the Seabrook Station Nuclear Generating Plant. After the bankruptcy filing, negotiations began among several interested parties to formulate a reorganization plan. The State intervened in the bankruptcy matter and participated in the negotiation process to protect its interest in assuring an adequate source of electricity for its residents at reasonable rates. After reviewing several competing reorganization plans, the State, through the Governor and attorney general, entered into an agreement on November 22, 1989, with Northeast Utilities (NU), a Massachusetts business trust and registered public utility holding company under 15 U.S.C. §§ 79 *et seq.* (1994), to resolve the Chapter 11 reorganization proceedings

(rate agreement). PSNH supported the rate agreement, and the other interested parties withdrew from the negotiations.

The rate agreement involved a merger of PSNH and NU, resulting in financial and other significant benefits to both companies. An integral part of the rate agreement provided for the State to permit an average base retail rate increase of 5.5 percent annually for seven years (fixed rate period) based on total average retail rates of 9.02 cents per kilowatt hour in effect on September 15, 1989. The fixed rate period began on June 1, 1990, and ended on May 31, 1997. The 5.5 percent increases were anticipated to result in "real rates . . . ris[ing] one percent per year over inflation." *Re Northeast Utilities/Public Service Company of New Hampshire*, 75 N.H.P.U.C. 396, 416 (1990) (hereinafter cited as *Re Northeast Utilities*). The rate agreement also included provisions stating that after the fixed rate period, certain intangible deferred assets would be included in PSNH's rates for various defined time periods. The PUC expected that PSNH's resulting rates would approximate the regional average. Unfortunately, that has not proven to be the case. PSNH's average retail price for electricity at the time the transferred questions were filed was over twelve cents per kilowatt hour, one of the highest average rates in the country.

Because, as the parties agreed, the Governor and attorney general could not bind the State without legislative approval, the rate agreement required the State to seek legislation to make it "an enforceable obligation of the State." Consistent with the rate agreement, the legislature enacted RSA chapter 362-C (enabling statute), which authorized the PUC to determine whether implementation of the rate agreement would be consistent with the public good, and whether the rates for electric service to be established as part of the reorganization were just and reasonable. RSA 362-C:3 (1995); *Re Northeast Utilities*, 75 N.H.P.U.C. at 401; *Appeal of Richards*, 134 N.H. at 161, 590 A.2d at 594. The bankruptcy court's approval of the reorganization plan was conditioned on the PUC's acceptance of the rate agreement.

By order dated July 20, 1990, the PUC ruled that implementation of the rate agreement as "set forth [in its order]" was "consistent with the public good" and would "result in just and reasonable rates that equitably balance the interests of ratepayers and investors." *Re Northeast Utilities*, 75 N.H.P.U.C. at 472. In addition to approving the seven-year fixed rate period and the deferred asset recovery provisions, the PUC found that its "traditional ratemaking authority [would] resume[] [after that fixed rate period], at which point it [could] adjust rates as it deem[ed] appropriate." *Id.* at 410,

478. Following the PUC's approval, NU paid approximately $2.3 billion in cash and securities to PSNH's creditors and equity security holders in exchange for the benefits it received under the rate agreement.

In 1996, the legislature enacted RSA chapter 374-F (restructuring statute), which led to the dispute presently before us. In that statute, the legislature directed the PUC to devise a restructuring plan in which electric generation services and rates would be extracted from the traditional regulatory scheme, unbundled, and subjected to market competition. *See* RSA 374-F:3, III, :4, II (Supp. 1998). The restructuring statute authorizes the PUC to permit utilities to recover costs that are otherwise unrecoverable due to generation deregulation by awarding them interim and final stranded costs, *see* RSA 374-F:4, V, VI (Supp. 1998), defined as

> costs, liabilities, and investments, such as uneconomic assets, that electric utilities would reasonably expect to recover if the existing regulatory structure with retail rates for the bundled provision of electric service continued and that will not be recovered as a result of restructured industry regulation that allows retail choice of electricity suppliers, unless a specific mechanism for such cost recovery is provided. Stranded costs may only include costs of:
> (a) Existing commitments or obligations incurred prior to the effective date of this chapter;
> (b) Renegotiated commitments approved by the [PUC]; and
> (c) New mandated commitments approved by the [PUC].

RSA 374-F:2, IV (Supp. 1998). Under the statute, the PUC retains the discretion to award stranded costs that are "equitable, appropriate, and balanced, . . . in the public interest, and . . . substantially consistent with these interdependent principles." RSA 374-F:4, V, VI.

After a nine-month investigation, which included public comments on a preliminary plan and several public hearings, the PUC issued a final restructuring plan pursuant to RSA 374-F:4. *Restructuring New Hampshire's Electric Utility Industry: Final Plan*, No. DR 96-150 (N.H.P.U.C. February 28, 1997). According to the plan, one factor for determining recoverable stranded costs is the regional average rate for electricity. *Id.* at 59-60. As a result, utilities with rates that equal or exceed the regional average may have a reduced opportunity to recover stranded costs, regardless of their amount.

The PUC's final restructuring plan also established interim stranded cost awards for several utilities, including PSNH. The PUC examined each utility's circumstances in separate, formal hearings. PSNH sought a rehearing on its interim award, claiming entitlement to private contractual rights under the rate agreement. Specifically, PSNH contended that the PUC was obligated to award it stranded costs resulting in full recovery (plus a return) of the deferred assets pursuant to the terms of the rate agreement. PSNH claims that the rate agreement provided for full recovery of NU's $2.3 billion capitalization of PSNH through (1) annual 5.5 percent increases during the seven-year fixed rate period, and (2) incorporation of the deferred assets in its rates thereafter.

Prior to ruling on the rehearing motion, the PUC transferred to this court the questions at issue. The transferred questions essentially ask whether the restructuring statute, RSA chapter 374-F, affected the PUC's obligations, if any, under RSA 362-C:6 (1995) to comply with the rate agreement when setting a stranded cost recovery charge for PSNH under RSA 374-F:4, V (final) and RSA 374-F:4, VI (interim).

At the outset, we observe that this case is not before us on appeal from a final judgment in which the PUC issues a decision with factual findings and legal rulings, the aggrieved party unsuccessfully seeks rehearing, and the entire PUC record on the appealed order is before us, see SUP. CT. R. 10; rather, it is interlocutory. The record before us reflects that the PUC issued an order awarding PSNH an interim stranded cost charge, deferred ruling on PSNH's motion for rehearing, and transferred the pending questions to this court for review pursuant to RSA 365:20 and Supreme Court Rule 9. Therefore, our review is limited to questions of law. See RSA 365:20; SUP. CT. R. 9. We answer the questions to the extent possible at this juncture to offer guidance to the PUC in fulfilling its statutory obligations under RSA chapter 374-F. In so doing, we are acutely aware that we do not have a final order or complete record before us, and are cautious to address only questions of law not dependent upon underlying disputed facts.

We recognize that the transferred questions invite us to determine, inter alia, whether the rate agreement constitutes a binding contract, and the terms of that contract, particularly PSNH's entitlement to deferred asset recovery. We, however, are unable to decide that discrete issue based on the incomplete record before us.

There are circumstances in which a binding contract can exist between a private party and the government involving subject matter otherwise regulated by the government. See generally, e.g.,

*Alaska Pub. Util. Com'n v. Munic. of Anchorage,* 555 P.2d 262, 266-67 (Alaska 1976); *Initiative for Competitive Energy v. Long Island Power Authority,* No. 12125-98, 1998 WL 828096, at *4, 8 (N.Y. Sup. Ct. October 7, 1998); *Scott Paper Co. v. City of Anacortes,* 578 P.2d 1292, 1297-99 (Wash. 1978). In this case, the documents that allegedly create a contractual obligation on the State to award PSNH full deferred asset recovery are the rate agreement, RSA chapter 362-C, and the PUC's 1990 order accepting the rate agreement. While the PUC in its order anticipated returning to traditional ratemaking and determining rates for PSNH as it deemed appropriate after the seven-year fixed rate period, the order also approved the rate agreement as written, including the deferred asset recovery provisions at issue. Therefore, a review of the rate agreement itself is necessary to determine the nature and scope of any contractual obligation it may have created.

Whether the rate agreement constitutes a binding contract, and if so, the terms of that contract, depends upon the parties' intent. *See Seal Tanning Co. v. City of Manchester,* 118 N.H. 693, 698, 393 A.2d 1382, 1385 (1978) (intent to be contractually bound); *Echo Consulting Services v. North Conway Bank,* 140 N.H. 566, 569, 669 A.2d 227, 230 (1995) (intent of contractual terms). While the language of a purported contract document is the initial indicator of the parties' intent, *see Dunn v. CLD Paving,* 140 N.H. 120, 122, 663 A.2d 104, 106 (1995), the surrounding circumstances may also be relevant, *see Guy v. Hanley,* 111 N.H. 73, 75, 276 A.2d 1, 3 (1971), especially where the document's terms are ambiguous, *see Richey v. Leighton,* 137 N.H. 661, 663-64, 632 A.2d 1215, 1216 (1993).

The language of the rate agreement before us is arguably ambiguous. The parties dispute the contractual import and scope of its language relating to PSNH's recovery of deferred assets following the fixed rate period, and direct our attention to extrinsic evidence demonstrating respective intent. Such extrinsic evidence includes, *inter alia,* various testimonial excerpts from hearings before the PUC and documentation reflecting the events leading up to the creation of the rate agreement and merger of NU and PSNH, the parties' conduct in response to the rate agreement, and the expectations and promises underlying the terms of the rate agreement. Thus, proper resolution of the rate agreement's contractual character and scope may well require a review of the facts and circumstances beyond the four corners of the rate agreement itself. As earlier noted, however, the record before us is incomplete and thus inadequate for us to competently review these issues.

■ In March 1997, immediately after the PUC adopted the final restructuring plan pursuant to RSA chapter 374-F, and before receiving a decision on rehearing, PSNH filed an action in federal court challenging the constitutionality of that plan, including, *inter alia*, an assertion of a Contracts Clause claim. *See Public Serv. Co. of N.H. v. Patch*, No. 98-1764, 1998 WL 823177, at *2 (1st Cir. December 3, 1998). Whether the rate agreement constitutes a binding contract is a critical and necessary component of that litigation. *See Opinion of the Justices (Furlough)*, 135 N.H. 625, 631, 609 A.2d 1204, 1208 (1992). Because the contract issue is pending before the federal court, which will have the benefit of a complete factual record, *see Tsiatsios v. Tsiatsios*, 140 N.H. 173, 177-78, 663 A.2d 1335, 1339 (1995), an advantage we do not currently enjoy, we decline at present to offer any opinion on whether the rate agreement constitutes a binding contract. Accordingly, in response to the transferred questions, we review only questions of law and limit our determination to the impact of RSA chapter 374-F on the rate agreement and RSA chapter 362-C. Such determination may be helpful to the federal court in resolving PSNH's pending claims and to the PUC in fulfilling its statutory obligations under RSA chapter 374-F.

After reviewing both statutes, we hold that RSA chapter 362-C and RSA chapter 374-F can be interpreted consistently such that when determining whether, and to what extent, PSNH can recover stranded costs under RSA chapter 374-F, the PUC must consider any existing State obligations to provide recovery of deferred assets under the rate agreement and RSA 362-C:6. In accord with the legislature's intent concerning RSA chapter 374-F, however, the PUC's stranded costs award to PSNH is determined by the discretionary standard in RSA 374-F:4, V and VI.

PSNH argues that the restructuring statute did not explicitly or implicitly "amend, repeal, or authorize departure from RSA 362-C:6." RSA 362-C:6 requires the PUC to fix rates for PSNH in the manner prescribed in the rate agreement, and prohibits the PUC from issuing

> any order or process which would alter, amend, suspend, annul, set aside or otherwise modify [the PUC's approval of the rate agreement] or result in the fixing of rates other than in the manner prescribed in the agreement.

PSNH contends that RSA 362-C:6's directive to comply with the rate agreement is unaffected by the enactment of RSA chapter 374-F. Thus, it argues that the PUC must award it a stranded cost

recovery charge that recognizes all deferred assets under the rate agreement. PSNH claims that RSA 362-C:6 and RSA chapter 374-F can, and *must*, be consistently construed. We agree with PSNH that RSA chapter 362-C and RSA chapter 374-F can be consistently construed, but not in the manner it suggests.

■ We are the final arbiter of "the legislature's intent as expressed in the words of the statute considered as a whole." *Pope v. Town of Hinsdale*, 137 N.H. 233, 237, 624 A.2d 1360, 1362 (1993). We examine the plain language of the statute to determine legislative intent. *Petition of Walker*, 138 N.H. 471, 474, 641 A.2d 1021, 1024 (1994). "When interpreting two statutes which deal with a similar subject matter, we will construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statute." *State v. Farrow*, 140 N.H. 473, 475, 667 A.2d 1029, 1031 (1995) (quotation omitted). We construe the statutes as consistent with each other "[w]here reasonably possible." *State v. Philbrick*, 127 N.H. 353, 356, 499 A.2d 1341, 1343 (1985).

■ The restructuring statute defines stranded costs to include costs of "[e]xisting commitments or obligations incurred prior to the effective date of this chapter." RSA 374-F:2, IV(a). The plain language of "[e]xisting commitments or obligations" necessarily incorporates any existing State obligations within the rate agreement and RSA chapter 362-C. Thus, the PUC must consider State obligations under RSA chapter 362-C and the rate agreement, if any, when determining whether, and to what extent, PSNH receives an award of stranded costs. The legislature, however, specifically limited a utility's recovery of stranded costs to those which are "equitable, appropriate, and balanced, . . . in the public interest, and . . . substantially consistent with these interdependent principles." RSA 374-F:4, V, VI. Therefore, under the terms of the restructuring statute, the PUC can award PSNH only those stranded costs, including the deferred assets under the rate agreement, that comport with the standard mandated by the legislature in RSA 374-F:4, V and VI. Accordingly, PSNH's ability to recover the deferred assets under the rate agreement through stranded cost recovery charge is limited by that standard.

To the extent that PSNH might be entitled to recover deferred assets under the rate agreement and RSA 362-C:6 that are not recoverable under the standard set forth in RSA 374-F:4, V and VI, RSA chapter 374-F controls. *See Petition of Public Serv. Co. of N.H.*, 130 N.H. at 283, 539 A.2d at 274 (when conflict exists between

two statutes, later statute prevails); *see also State v. Perra*, 127 N.H. 533, 537, 503 A.2d 814, 817 (1985) (when natural weight of competent evidence shows that latter statute's purpose was to supersede former, latter controls even absent explicit repealing language). Whether any stranded cost award to PSNH that provides less than it is allegedly entitled to under the rate agreement and RSA chapter 362-C gives rise to a claim appears to be the basis of the claims pending in federal court.

Reading the enabling statute and the restructuring statute as consistent in the prescribed manner permits the State to attempt to honor its obligation, if any, under RSA chapter 362-C and the rate agreement while still effectuating the legislature's intent to provide electric rate relief to New Hampshire citizens through the deregulation of generation services. The purpose section of the restructuring statute specifically identifies "[t]he most compelling reason to restructure the New Hampshire electric utility industry [as] reduc[ing] costs for all consumers of electricity by harnessing the power of competitive markets." RSA 374-F:1, I (Supp. 1998). In the public law encompassing the restructuring statute, the legislature expressly found that

> New Hampshire has the highest average electric rates in the nation and such rates are unreasonably high. *The general court also finds that electric rates for most citizens may further increase during the remaining years of the Public Service Company of New Hampshire rate agreement and that there is a wide rate disparity in electric rates both within New Hampshire and as compared to the region.* The general court finds that this combination of facts has a particularly adverse impact on New Hampshire citizens.

Laws 1996, 129:1, I (emphasis added). Thus, the legislature viewed the rate agreement as a significant contributor to the exceedingly high electric rates in our State, which motivated it to enact the restructuring statute to deregulate electric generation rates and services while providing a mechanism for stranded costs recovery. *See* Laws 1996, ch. 129. Accordingly, our interpretation of the interplay between RSA chapter 362-C and RSA chapter 374-F is consistent with the purpose of the restructuring statute and the legislature's intent when enacting it. If the legislature disagrees with our statutory interpretation, it may always clarify its intent.

Before concluding, we emphasize the narrowness of the inquiry before us. The transferred questions seek a review of the restructuring statute's impact upon RSA chapter 362-C and the rate

agreement. The restructuring statute deregulates only *generation* services and rates and does not apply to *transmission* and *distribution* services. *See* RSA 374-F:1, I, :3, III; *see also* RSA 374-F:3, XII(d) (Supp. 1998) (stranded costs "should not include transmission and distribution assets"). Therefore, we offer no opinion as to whether the PUC may have an obligation under RSA chapter 362-C to comply with the rate agreement in determining recovery of deferred assets for transmission and distribution services.

In addition, a fair reading of the transferred questions does not invite a review of the constitutionality of RSA chapter 374-F. Moreover, as noted earlier, PSNH has challenged the constitutionality of the restructuring statute in pending federal court litigation. Thus, we offer no opinion on whether the restructuring statute gives rise to any constitutional claims.

For the foregoing reasons, we answer both questions in the affirmative with the limitations outlined within this opinion.

*Remanded.*

All concurred.